JOSH A. COHEN (SBN 217853)
633 Battery St., Suite 110
San Francisco, California  94111
(415) 693-9173
josh@cohenlawsf.com

LAWRENCE S. LUSTBERG (*pro hac vice*)
Gibbons PC
One Gateway Center
Newark, New Jersey 07102
(973) 596-4731
llustberg@gibbonslaw.com

Attorneys for Defendant
JOSEPH CAROZZA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>     v.<br><br>JOSEPH CAROZZA,<br><br>          Defendant. | CASE NO. CR-10-0642 CRB<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS**<br><br>Date:      November 30, 2010<br>Time:      2:15 p.m.<br>Courtroom:  8 |

TO:     THIS HONORABLE COURT, AND GOVERNMENT COUNSEL, AND DEFENSE
         COUNSEL:

        PLEASE TAKE NOTICE that on November 30, 2010 at 2:15 p.m., or as soon thereafter as

this matter may be heard, in the courtroom of the Honorable Charles R. Breyer, United States

District Judge, defendant Joseph Carozza will, and hereby does, move this Court pursuant to

Federal Rule of Criminal Procedure 12(b)(3) to dismiss the indictment against him for failure to

state an offense.  This motion is based upon the supporting memorandum of law; the pleadings

1 and records on file in this matter; and such evidence and argument as may be presented prior to

2 and at the hearing on this motion.

3

4 DATED: November 17, 2010                    Respectfully submitted,

5

6

7                                             By    /s/
                                                    Josh A. Cohen
8                                                   Attorney for JOSEPH CAROZZA

9

10

11                                            By    /s/
                                                    Lawrence S. Lustberg
12                                                  Attorney for JOSEPH CAROZZA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iv

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

ARGUMENT ..................................................................................................................... 3

I.    THE INDICTMENT SHOULD BE DISMISSED FOR FAILURE TO STATE
AN OFFENSE BY DR. CAROZZA ......................................................................... 3

    A.    Dismissal Is Appropriate Where An Indictment Fails to State an
Offense ............................................................................................................ 3

    B.    The Indictment Fails To State An Offense By Dr. Carozza ........................ 5

        1.    *A Physician Cannot Be Held Criminally Liable Under the
Controlled Substances Act Based Solely On the Manner In
Which He Conducts His Medical Practice* ......................................... 6

        2.    *The Indictment Does Not Allege Facts Sufficient To State A
Violation of the Controlled Substances Act By Dr. Carozza
In 2006* ............................................................................................10

II.    THE INDICTMENT SHOULD BE DISMISSED BECAUSE IT
IMPERMISSIBLY INTRUDES ON THE STATES' EXCLUSIVE
PROVINCE TO REGULATE THE PRACTICE OF MEDICINE ........................12

III.    THE INDICTMENT SHOULD BE DISMISSED BECAUSE DR.
CAROZZA'S ALLEGED CONDUCT WAS NOT PROHIBITED
UNTIL PASSAGE OF THE RYAN HAIGHT ACT IN 2008 ................................15

    A.    The *Ex Post Facto* Clause Bars Retroactive Application of Laws
Creating New Offenses ................................................................................15

    B.    The Ryan Haight Act Created A New Offense ........................................... 16

    C.    Prosecuting Dr. Carozza For Conduct Criminalized By the Ryan
Haight Act Violates the *Ex Post Facto* Clause .......................................... 20

CONCLUSION ................................................................................................................ 21

Case No. CR-10-0642 CRB
MOTION TO DISMISS

# TABLE OF AUTHORITIES

<u>CASES</u>

*Astoria Fed. Savs. & Loan Ass'n v. Solimino,*
  501 U.S. 104 (1991) ........................................................................................ 19

*Barsky v. Bd. Of Regents,*
  347 U.S. 442 (1954) ........................................................................................ 12

*Bouie v. City of Columbia,*
  378 U.S. 347 (1964) ........................................................................................ 16

*Buckman Co. v. Plaintiffs' Legal Committee,*
  531 U.S. 341 (2001) .......................................................................................... 6

*Calder v. Bull,*
  3 Dall. 386 (1798) .................................................................................... 15, 20

*California Dep't of Corrections v. Morales,*
  514 U.S. 499 (1995) ........................................................................................ 15

*Carmell v. Texas,*
  529 U.S. 513 (2000) .................................................................................. 15, 16

*Cleveland v. United States,*
  531 U.S. 12 (2000) .................................................................................... 13, 14

*Conant v. Walters,*
  309 F.3d 629 (9th Cir. 2002) ......................................................................... 12

*Dent v. West Virginia,*
  129 U.S. 114 (1889) .......................................................................................... 6

*Doe v. Bolton,*
  410 U.S. 179 (1973) .......................................................................................... 6

*Estate of Bell v. Comm'r,*
  928 F.2d 901 (9th Cir. 1991) ......................................................................... 19

*Estelle v. Gamble,*
  429 U.S. 97 (1976) ............................................................................................ 6

*Gonzales v. Oregon,*
  546 U.S. 243 (2006) .......................................................................... 9, 11, 13, 14

*Intel Corp. v. Advanced Micro Devices, Inc.,*
  542 U.S. 241 (2004) ........................................................................................ 19

iv

*Linder v. United States*,
   268 U.S. 5 (1925) ........................................................................................................12

*Miller v. Florida*,
   482 U.S. 423 (1987) ....................................................................................................15

*Moskal v. United States*,
   498 U.S. 103 (1990) ....................................................................................................19

*Negonsott v. Samuels*,
   507 U.S. 99 (1993) ......................................................................................................19

*New York Dep't of Soc. Servs. v. Dublino*,
   413 U.S. 405 (1973) ....................................................................................................13

*Ratzlaf v. United States*,
   510 U.S. 135 (1994) ....................................................................................................19

*Robinson v. California*,
   370 U.S. 660 (1962) ....................................................................................................12

*Rodriguez v. United States*,
   480 U.S. 522 (1987) ....................................................................................................19

*Russell v. United States*,
   369 U.S. 749 (1962) ......................................................................................................4

*Russello v. United States*,
   464 U.S. 16 (1983) ......................................................................................................19

*Schwartz v. Texas*,
   344 U.S. 199 (1952) ....................................................................................................13

*Stenberg v. Carhart*,
   530 U.S. 913 (2000) ......................................................................................................6

*Stogner v. California*,
   539 U.S. 607 (2003) ..............................................................................................15, 16

*Stone v. INS*,
   514 U.S. 386 (1995) ....................................................................................................19

*United States ex rel. Mikes v. Straus*,
   84 F. Supp. 2d 427 (S.D.N.Y. 1999) ............................................................................7

*United States ex rel. Phillips v. Permian Residential Care Ctr.*,
   386 F. Supp. 2d 879 (W.D. Tex. 2005) .........................................................................7

*United States ex rel. Polansky v. Pfizer*,
   2009 WL 1456582 (E.D.N.Y. May 22, 2009) ...............................................................6

Case No. CR-10-0642 CRB
MOTION TO DISMISS

*United States v. Al Hedaithy,*
  392 F.3d 580 (3d Cir. 2004) ........................................................................... 4

*United States v. Al Safarini,*
  25 F. Supp. 2d 191 (D.D.C. 2003) ................................................................ 15

*United States v. Boettjer,*
  569 F.2d 1078 (9th Cir. 1978) .................................................................... 7, 8

*United States v. Boren,*
  278 F.3d 911 (9th Cir. 2002) ....................................................................... 4, 5

*United States v. Cecil,*
  608 F.2d 1294 (1979) ................................................................................. 3, 4

*United States v. Collier,*
  478 F.2d 268 (5th Cir. 1973) ......................................................................... 11

*United States v. Feingold,*
  454 F.3d 1001 (9th Cir. 2006) ............................................................. 7, 10, 11

*United States v. Garsson,*
  291 F.2d 646 (S.D.N.Y. 1923) ........................................................................ 5

*United States v. Hayes,*
  794 F.2d 1348 (9th Cir. 1986) ....................................................................... 11

*United States v. Hooker,*
  541 F.2d 300 (1st Cir. 1976) .......................................................................... 11

*United States v. Johnson,*
  831 F.2d 124 (6th Cir. 1987) ......................................................................... 10

*United States v. Juvenile Male,*
  819 F.2d 468 (4th Cir. 1987) ......................................................................... 15

*United States v. Kaplan,*
  895 F.2d 618 (9th Cir. 1990) ......................................................................... 11

*United States v. Larson,*
  722 F.2d 139 (5th Cir. 1983) ......................................................................... 11

*United States v. Moore,*
  423 U.S. 122 (1975) ............................................................................. 7, 8, 10

*United States v. Polan,*
  970 F.2d 1280 (3d Cir. 1992) ......................................................................... 11

*United States v. Polychron,*
  841 F.2d 833 (8th Cir. 1988) ..................................................................... 4, 11

Case No. CR-10-0642 CRB
MOTION TO DISMISS

*United States v. Rosenberg,*
515 F.2d 190 (9th Cir. 1975) ....................................................................8, 11

*United States v. Roya,*
574 F.2d 386 (7th Cir. 1978) ..........................................................................10

*United States v. Shortt Accountancy Corp.,*
785 F.2d 1448 (9th Cir. 1986).........................................................................5

*United States v. Smurthwaite,*
590 F.2d 889 (10th Cir. 1979)........................................................................10

*United States v. Tran Truong Cuong,*
18 F.3d 1132 (4th Cir. 1994) .......................................................................7, 9

*United States v. Vuitch,*
402 U.S. 62 (1971) ...........................................................................................6

*United States v. Wilson,*
503 U.S. 333 (1992) ........................................................................................19

*Walters v. National Ass'n of Radiation Survivors,*
473 U.S. 305 (1985) ........................................................................................19

*Washington Legal Foundation v. Friedman,*
13 F. Supp. 2d 51 (D.D.C. 1998) .....................................................................6

*Washington v. Glucksberg,*
521 U.S. 702 (1997) ........................................................................................11

*Weaver v. Reagen,*
886 F.2d 194 (8th Cir. 1989) ...........................................................................6

*Webster v. Woodford,*
369 F.3d 1062 (9th Cir. 2004)........................................................................16

*Whalen v. Roe,*
429 U.S. 589 (1977) ........................................................................................12

STATUTES

21 U.S.C. § 829(e)(1) ...........................................................................................17

21 U.S.C. § 829(e)(2)(A) ...............................................................................17, 20

21 U.S.C. § 841 .................................................................................................2, 8

21 U.S.C. § 841(a)(1) .............................................................................................2

Case No. CR-10-0642 CRB
MOTION TO DISMISS

21 U.S.C. § 846 ............................................................................................................2

21 U.S.C. § 903 ..........................................................................................................13

Cal. Bus. & Prof. Code § 2004 (Deering 2010) .......................................................13

Cal. Civ. Proc. Code § 340.5 (Deering 2010) ..........................................................13

N.J. Stat. Ann. §§ 45:9-1, *et seq.* ...........................................................................13

N.Y. Educ. Law §§ 6522-24 (Consol. 2010) ............................................................13

U.S. Const. Art. I, § 9, cl. 3 ......................................................................................15

OTHER AUTHORITIES

110 Cong. Rec. S3715 (daily ed. March 23, 2007) ..................................................18

Food & Drug Admin.,
   *Use of Approved Drugs for Unlabeled Indications*, 12 FDA Drug Bulletin 4  (1982) ................6

H.R. Rep. No. 110-869 (2008) ..................................................................................17

*Online Pharmacies and the Problem of Internet Drug Abuse: Hearing Before the*
   *Subcomm. on Crime, Terrorism and Homeland Security of the House Comm. on the*
   *Judiciary* [hereinafter, *Online Pharmacies Hearing*], 110th Cong. 1-2 (2008) ........................18

Patrick J. Egan,
   *Internet Pharmacy: Gray Area With Big Profit and High Risks*, The Champion 32 (Dec.
   2005) ....................................................................................................................11

*Rannazzisi, Joseph, ( Deputy Director, DEA Office of Enforcement Operations)*
   *Safety of Imported Pharmaceuticals: Strengthening Efforts to Combat the Sales of*
   *Controlled Substances Over the Internet: Hearing Before the Subcomm. on Oversight*
   *and Investigations of the House Comm. on Energy & Commerce*, 109th Cong. 106
   (2005) ...................................................................................................................16

*Safety of Imported Pharmaceuticals: Strengthening Efforts to Combat the Sales of*
   *Controlled Substances Over the Internet: Hearing Before the Subcomm. on Oversight*
   *and Investigations of the House Comm. on Energy & Commerce*, 109th Cong. 106
   (2005) ...................................................................................................................16

RULES

Fed. R. Crim. P. 12(b)(3)(B) .....................................................................................4

Case No. CR-10-0642 CRB
MOTION TO DISMISS

1

<u>REGULATIONS</u>

2

21 C.F.R. § 1306.04 ............................................................................................................14

3

21 C.F.R. § 1306.04(a) .........................................................................................................4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### Introduction

In 2006, defendant Joseph Carozza, M.D. allegedly approved Internet prescriptions of Class III and IV controlled substances for patients whose medical histories and symptoms he evaluated by way of online questionnaire.  In 2008, Congress passed legislation to require in-person evaluations before the issuance of online prescriptions.  In 2010, the government filed criminal charges against Dr. Carozza for failing to conduct such evaluations.  Accordingly, Dr. Carozza now stands accused of violating the Controlled Substances Act (CSA) by omitting an examination he was not required to conduct.

This is not the way the American criminal justice system is supposed to work.  It has been settled law for decades that a physician cannot be criminally prosecuted for the manner in which he exercises his professional medical judgment absent violation of an express statutory prohibition.  At the time of Dr. Carozza's alleged offense, there was no such prohibition on the books.  Neither the Controlled Substances Act nor any other provision of law required Dr. Carozza to conduct a physical exam prior to issuing a prescription online.

It was not until 2008, with the passage of the Ryan Haight Act, that Congress first required an in-person evaluation as a condition of a valid online prescription.  As the Act's legislative history makes clear, both Congress and the DEA—not to mention the medical community— understood this requirement to create a new offense.  By criminalizing online prescriptions issued without in-person exams, Congress filled a gap in the law and enabled the government to prosecute physicians under precisely the theory espoused by the United States in this case.

According to the indictment, however, Dr. Carozza ceased online prescriptions *two full years* before the Ryan Haight Act became law.  As such, the prosecution of Dr. Carozza is an unmistakable attempt to punish him for conduct that did not become criminal until two years after it was complete.  This is squarely prohibited by the Constitution's *Ex Post Facto* Clause.

The indictment of Dr. Carozza for pre-2008 conduct also violates core principles of federalism.  The regulation of medical practice—and the doctor-patient relationship in particular— is entrusted to the general police power of the states.  Where Congress has not spoken clearly to

Case No. CR-10-0642 CRB

MOTION TO DISMISS

prohibit a particular practice, the government's attempt to criminalize that practice impermissibly intrudes on the states' exclusive province to determine appropriate standards of professional medical conduct.

To be sure, the government can prosecute drug dealers—as well as physicians who so completely abdicate their medical judgment as to constitute drug dealers in effect. Here, however, the government has not alleged that Dr. Carozza crossed the line from physician to drug pusher. The indictment does not allege that Dr. Carozza issued prescriptions to addicts, to dealers, to patients for whom they were not indicated, or to anyone willing to pay. Rather, the sum and substance of the government's indictment is based entirely upon the *manner* in which Dr. Carozza conducted his professional practice—specifically, by issuing prescriptions online without first conducting a face-to-face exam. But until 2008, practicing medicine in this way simply was not a crime.

Not surprisingly, this prosecution is unprecedented in this Circuit. Never before has the Ninth Circuit Court of Appeals—or any court in this district—held that an indictment premised solely on a licensed physician's failure to examine a patient before issuing a prescription online, more than two years before such examinations were required by law, is sufficient to state an offense. This Court should not be the first. For the reasons stated herein, the Court should grant Dr. Carozza's motion and dismiss the charges against him.

### Background

On August 31, 2010, a federal grand jury sitting in the United States District Court for the Northern District of California (San Francisco) returned a thirteen-count indictment against eleven out-of-state defendants based on their alleged associations with three so-called online pharmacies. Defendant Joseph Carozza, M.D., is charged in Counts 1 and 2 with conspiracy to distribute and distribution of Schedule III and IV controlled substances, in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1). According to the indictment, Dr. Carozza committed these offenses by engaging in the following conduct:

> 2.     Defendant JOSEPH CAROZZA was a medical doctor licensed only in the State of New York. As part of the conspiracy, several doctors, including CAROZZA, approved customer orders for controlled substances for

Safescripts Online that were not for a legitimate medical purpose and when the doctor was not acting in the usual course of his or her professional practice.

3.   The completed on-line questionnaires were made available by Safescripts Online to, among others, defendant CAROZZA, who purported to review the on-line questionnaires and approve a prescription for the Controlled Substances requested by the customers. The on-line questionnaires asked the customers to briefly describe their medical history. At no time during the questionnaire review process did defendant CAROZZA or any other approving physician physically examine or obtain a complete medical history from the customers. Nor did CAROZZA or any other approving physician make any effort to confirm the accuracy of the information provided by the customers in the on-line questionnaire. Rather, after reviewing only the customers' on-line questionnaires, defendant CAROZZA or another approving physician authorized a purported prescription for the Controlled Substances requested by the customers.

4.   After defendant CAROZZA or another approving physician authorized a purported prescription for the Controlled Substances, owners and employees of various fulfillment pharmacies in various locations across the United States accessed the Safescripts Online computer program to locate customer orders for which CAROZZA or another approving physician purportedly authorized prescriptions. Those fulfillment pharmacies then filled and shipped the Controlled Substances to the customers.

Indictment ¶¶ 2-4.

A criminal indictment must allege sufficient facts to put a defendant on notice of the conduct he is alleged to have committed that constituted a criminal offense. *See United States v. Cecil*, 608 F.2d 1294, 1296 (1979) ("[T]he indictment must set forth the elements of the offense charged and contain a statement of the facts and circumstances that will inform the accused of the specific offense with which he is charged."). Although recitation of the statutory elements may suffice in simple cases, more complex prosecutions require more sophisticated notice. Thus, "[i]t is an elementary principle of criminal pleading, that where the definition of an offence . . .

Dr. Carozza is not mentioned at any other point in the indictment's description of the alleged offense. Counts 1 and 2 of the Indictment, which appear at paragraphs 32 through 35, allege that Dr. Carozza engaged in this conduct between November 2004 and December 2006. Indictment ¶¶ 33, 35.

**Argument**

## I.   THE INDICTMENT SHOULD BE DISMISSED FOR FAILURE TO STATE AN OFFENSE BY DR. CAROZZA

### A.   Dismissal Is Appropriate Where An Indictment Fails To State An Offense

1  includes generic terms, it is not sufficient that the indictment shall charge the offence in the same

2  generic terms as in the definition; but it must state the species,—it must descend to particulars."

3  *Russell v. United States*, 369 U.S. 749, 764-65 (1962) (citation and internal quotes omitted).

4          Federal Rule of Criminal Procedure 12(b)(3) permits a court to dismiss an indictment "at

5  any time while the case is pending" for failure to "state an offense." Fed. R. Crim. P. 12(b)(3)(B).

6  When considering a motion brought under this rule, the court must examine the indictment as a

7  whole to determine whether the specific facts alleged constitute a violation of the pertinent

8  criminal statute. *See United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002) (stating that issue

9  on motion to dismiss is "whether a cognizable offense has been charged" within "the four corners

10 of the indictment"). Even where the elements are properly recited, dismissal is appropriate if the

11 particular facts alleged do not establish the charged offense. *United States v. Al Hedaithy*, 392

12 F.3d 580, 589 (3d Cir. 2004) ("[A]n indictment must allege that the defendant performed acts that,

13 if proven, would constitute a violation of the law under which he has been charged."); *United*

14 *States v. Polychron*, 841 F.2d 833, 834 (8th Cir. 1988) ("If the acts alleged in the indictment do

15 not constitute a violation of law, the indictment is properly dismissed."); *Cecil*, 608 F.2d at 1297

16 ("[T]he fact that an indictment may have tracked the language of the statute will not render it valid

17 if it fails to allege . . . the minimum facts required to fulfill the purposes of indictments.").

18         Here, the indictment alleges conspiracy to distribute and distribution of a controlled

19 substance. As the indictment acknowledges, however, this is not a garden-variety drug case. To

20 the contrary, the charging theory set forth in the indictment turns on an obscure provision of the

21 Code of Federal Regulations that defines a valid prescription. Under that provision, "[a]

22 prescription for a controlled substance to be effective must be issued for a legitimate medical

23 purpose by an individual practitioner acting in the usual course of his professional practice." 21

24 C.F.R. § 1306.04(a). According to the indictment, Dr. Carozza ran afoul of this provision—and

25 therefore violated the Controlled Substances Act—by issuing prescriptions on the basis of

26 information supplied by patients in online questionnaires rather than after face-to-face

27 consultations. Indictment ¶ 3.

28

The question for this Court, then, is not whether the indictment recites the elements of a violation of the Controlled Substances Act.  Rather, the question is whether the facts alleged in the indictment, if proven, establish a criminal offense.  *See Boren*, 278 F.3d at 914.  That is, if the Court finds as a matter of law that Dr. Carozza cannot be held criminally liable under the CSA for having failed, in 2006, to evaluate the history and symptoms of his patients in person rather than by written questionnaire, it should dismiss the indictment.

It is the Court, not the jury, that must make this determination.  Where it is clear that an indictment alleges facts sufficient to establish a crime, the jury's function is to decide whether the government has proven those facts at trial.  *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448 (9th Cir. 1986) (noting that "the ultimate trier of fact is concerned with the general issue of guilt").  It is the Court's role, however, to say whether the indictment has stated an offense in the first place.  *See Boren*, 278 F.3d at 914 ("The indictment either states an offense or it doesn't.").  Were it otherwise, a defendant in Dr. Carozza's position could be dragged through the expense and ignominy of a federal criminal trial to defend conduct that was not a crime.  *See United States v. Garsson*, 291 F.2d 646, 649 (S.D.N.Y. 1923) (Hand, J.) (noting that "indictments are calamities to honest men").

For the reasons stated below, even accepting all of the facts set forth as true, *Boren*, 278 F.3d at 915, the indictment in this case fails to state an offense by Dr. Carozza.  Accordingly, Dr. Carozza's motion should be granted and the charges against him dismissed.

**B.     The Indictment Fails to State An Offense By Dr. Carozza**

The indictment charges Dr. Carozza with failing to examine his patients in person before prescribing controlled medications.  This is not a crime.  While the government can prosecute a physician who so completely abdicates his professional judgment that he becomes a drug dealer, it could not—until 2008—prosecute a doctor simply because the doctor issued prescriptions based on written questionnaires.  The government's prosecution of Dr. Carozza, which seeks to do exactly that, contravenes decades of settled law concerning physicians' criminal liability for conduct performed in the course of professional medical practice.

1.   ***A Physician Cannot Be Held Criminally Liable Under the Controlled Substances Act Based Solely On the Manner In Which He Conducts His Medical Practice***

Federal courts have long been loath to engage in armchair medicine.  In a variety of contexts, from abortion to social security to prisoners' rights, courts and federal agencies accord substantial deference to doctors' professional judgments about appropriate medical care.[1]

This principle is especially pronounced in the realm of prescription medications.  For example, notwithstanding the government's well-developed infrastructure for testing, approving, and monitoring the use and administration of drugs and medical devices, it is well-established that a doctor can prescribe any drug for any purpose that he considers medically appropriate.[2]

---

[1] *See, e.g.*, *Stenberg v. Carhart*, 530 U.S. 913, 947 (2000) (noting "the judicial need to tolerate responsible differences of medical opinion"); *Doe v. Bolton*, 410 U.S. 179, 199 (1973) ("If a physician is licensed by the State, he is recognized by the State as capable of exercising acceptable clinical judgment."); *United States v. Vuitch*, 402 U.S. 62, 70-71 (1971) (holding that it would be "peculiarly inconsistent with society's notions of the responsibilities of the medical profession" to require physicians to prove the necessity of an abortion for a mother's health); *Estelle v. Gamble*, 429 U.S. 97, 107 (1976) (rejecting prisoner's Eighth Amendment claim because "the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment"); *Dent v. West Virginia*, 129 U.S. 114, 122-23 (1889) ("Reliance must be placed on the assurance given by his license, issued by an authority competent to judge in that respect, that [a physician] possesses the requisite qualifications.").  *See also Gonzales v. Oregon*, 546 U.S. 243, 266 (2006) ("The structure of the CSA . . . conveys unwillingness to cede medical judgments to an executive official who lacks medical expertise.").

[2] *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 350 (2001) (noting that the FDA must regulate marketing and distribution of drugs and devices "without intruding upon decisions statutorily committed to the discretion of health care professionals"); *Washington Legal Found. v. Friedman*, 13 F. Supp. 2d 51, 56 (D.D.C. 1998) (noting that off-label prescriptions are "an accepted aspect of a physician's prescribing regimen"); *Weaver v. Reagen*, 886 F.2d 194, 199 (8th Cir. 1989) (noting experts' consensus that physicians "commonly exercise professional medical judgment and prescribe drugs for uses not within the indications articulated by the FDA"); *United States ex rel. Polansky v. Pfizer*, No. 04-cv-0704, 2009 WL 1456582, at *6 (E.D.N.Y. May 22, 2009) (quoting Food & Drug Admin., *Use of Approved Drugs for Unlabeled Indications*, 12 FDA Drug Bulletin 4, 5 (1982) (noting that physicians' off-label usage of approved medications "may be appropriate and rational in certain circumstances").

Accordingly, enforcement actions targeting physicians' treatment and prescription decisions are not well received by the courts.[3]

Consistent with this general reluctance to invade the doctor's medical province, courts have repeatedly held that the Controlled Substances Act does not criminalize prescriptions written in the course of a doctor's practice for the treatment of illness or injury.  Thus, in *United States v. Moore*, 423 U.S. 122 (1975), the Supreme Court approved a jury instruction requiring that a doctor, to be convicted of a crime based on rampant methadone prescriptions, have acted for purposes other than treatment.  *Id.* at 139.  Similarly, in *United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006), the Ninth Circuit held that a physician cannot be convicted of a crime under the CSA based on prescriptions written "for a legitimate medical purpose."  *Id.* at 1011.  Even a prescription so far outside accepted medical norms as to constitute medical malpractice will not support criminal charges if issued by the physician for the treatment of a patient's condition.  *Id.* at 1010 ("We hold that an instruction is improper if it allows a jury to convict a licensed practitioner under § 841(a) solely on a finding that he has committed malpractice, intentional or otherwise.");  *United States v. Boettjer*, 569 F.2d 1078, 1082 (9th Cir. 1978) (holding that jury instruction permitting conviction "merely upon a showing of malpractice" is legally deficient); *United States v. Tran Truong Cuong*, 18 F.3d 1132, 1137 (4th Cir. 1994) (noting that a criminal conviction "requires more" than a showing of malpractice).

To be sure, no one—including doctors—is categorically exempt from prosecution under the CSA.  *See Moore*, 423 U.S. at 138.  Given the deference properly accorded to professional medical judgments, however, "[a] practitioner becomes a criminal not when he is a *bad* or *negligent* physician, but when he ceases to be a physician *at all*."  *Feingold*, 454 F.3d at 1011

---

[3] *See, e.g.*, *United States ex rel. Phillips v. Permian Residential Care Ctr.*, 386 F. Supp. 2d 879, 884 (W.D. Tex. 2005) (noting that "the False Claims Act should not be used to call into question a health care provider's judgment regarding a specific course of treatment"); *United States ex rel. Mikes v. Straus*, 84 F. Supp. 2d 427, 442 (S.D.N.Y. 1999) ("It is precisely because the Secretary does not tell doctors how to perform procedures that . . . the False Claims Act is a particularly ill-suited vehicle for deciding how they ought to be performed.").

1   (emphasis in original).  As Judge Betty Fletcher explained in *Feingold*, the touchstone of criminal

2   liability is not "malpractice, or even intentional malpractice, but rather . . . the fact that [a doctor's]

3   actions completely betrayed any semblance of legitimate medical treatment."  *Id.* at 1010.  Thus,

4   for a physician to be criminally liable under the CSA, he must have "so wantonly ignored the

5   basic protocols of the medical profession that 'he acted as a large-scale pusher—not as a

6   physician.'"  *Id.* (quoting *Moore*, 423 U.S. at 143).

7        Other Ninth Circuit cases likewise hold that a physician cannot be criminally prosecuted

8   under 21 U.S.C. § 841 unless he is a *de facto* drug dealer.  In *United States v. Rosenberg*, 515 F.2d

9   190 (9th Cir. 1975), a physician was tried on charges that he violated the CSA by prescribing

10  medications without regard for patient need.[4]  The Ninth Circuit approved the district court's jury

11  instructions, which required the jury "to determine whether [the defendant] prescribed the pills for

12  what he thought was a medical purpose or whether he was passing out the pills to anyone who

13  asked for them."  *Id.* at 197.  More specifically, the trial court instructed:

14         If this doctor was causing the controlled substance to be prescribed while acting
           as a doctor in the course of his professional practice, then there's no violation.
15         However, if he was not acting in good faith as a doctor, but simply pushing pills,
           . . . then he does not come within the exception [under the CSA] and the law is
16         violated.

17  *Id.*  The Ninth Circuit affirmed the doctor's conviction, holding that "a doctor is not exempt from

18  the statute when he takes actions that he does not in good faith believe are for legitimate medical

19  purposes."  *Id.*

20        Similarly, in *United States v. Boettjer*, 569 F.2d 1078 (9th Cir. 1978), a physician was

21  charged with writing prescriptions for Schedule II substances to anyone who requested them.[5]  As

22  _____

23      [4] "For example, when the doctor asked agent Van Diest what was wrong with her, she said
    that she did not have any problems, that she had been buying pills on the street and wanted a safer
24  source, and that she had heard that she could get them from him.  She told Dr. Rosenberg that she
    wanted some 'reds.'  When Dr. Rosenberg asked her why she wanted them, Ms. Van Diest said
25  that she just liked taking them."  *Id.* at 192.

26      [5] "Between March 12, 1976 and May 3, 1976 three part-time investigators of the Drug
    Enforcement Administration made a number of visits to the appellant's office, representing
27  themselves as patients, and sought prescriptions for . . . quaalude and . . . ritalin.  As part of their
           (footnote continued)

28

1   explained by the Ninth Circuit, "[t]he hard core issue in this case was whether Dr. Boettjer was

2   using his medical practice as a cover for the unauthorized distribution of controlled substances or

3   whether he acted in good faith as a medical practitioner responding to the legitimate medical needs

4   of his patients." *Id.* at 1082. Indeed, the prosecutor had argued to the jury that the defendant

5   could not be convicted if he "was acting as a doctor in treating a medical condition." *Id.* at 1082

6   n.3. It is only when "a doctor stops [acting] as a doctor, when a doctor stops treating people, when

7   he, instead, gives drugs to people because they like them, *then he is no longer a doctor*"—and

8   criminal charges may properly attach. *Id.* (emphasis added); *see also Tran Trong Chuong*, 18 F.3d

9   at 1137 (holding that a physician could be convicted under the CSA only if "his authority to

10  prescribe controlled substances was being used not for treatment of a patient, but for the purpose

11  of assisting in the maintenance of a drug habit or of dispensing controlled substances for other

12  than a legitimate medical purpose").

13         Accordingly, the case law is clear that a doctor cannot be prosecuted under the Controlled

14  Substances Act for writing prescriptions in the course of his medical practice—even if the manner

15  in which he writes them is outside the medical mainstream.[6] It is only when a doctor ceases to

16  function as a doctor at all—to the point where he is "using [his] prescription-writing powers as a

17  means to engage in illicit drug dealing and trafficking as conventionally understood"—that

18  criminal charges can properly be filed. *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006).

19

20

21

_____

22  training they had been instructed not to offer any medical reasons for the prescription of these

23  drugs." *Id.* at 1079.

24         [6] This rule is consistent with the purpose of the Controlled Substances Act. As the
    Supreme Court has noted, the CSA is "a statute combating recreational drug abuse." *Gonzales*,

25  546 U.S. at 272. Accordingly, it was not designed to reach medical practitioners who prescribe
    medications for the treatment of illness or injury. Had Congress meant to criminalize a particular

26  manner of writing prescriptions, it most certainly could have done so. *See id.* (noting that "when
    Congress wants to regulate medical practice in the given scheme, it does so by explicit language in

27  the statute").

28

**2.** ***The Indictment Does Not Allege Facts Sufficient To State A Violation of the Controlled Substances Act By Dr. Carozza In 2006***

Applying this standard to the indictment in this case, the government has failed to state an offense by Dr. Carozza.  The indictment does not allege that Dr. Carozza was a drug dealer as that term is "conventionally understood." *Id.*  It does not allege that Dr. Carozza failed to exercise medical judgment in connection with the prescriptions he wrote.  It does not allege that Dr. Carozza wrote prescriptions for patients who did not need them.  It does not allege that Dr. Carozza prescribed drugs to drug addicts, or to malingerers, or to anyone who asked, or to patients whose symptoms did not warrant the drugs that they received.  The indictment does not allege that Dr. Carozza's conduct in writing prescriptions based on written questionnaires "completely betrayed any semblance of legitimate medical treatment." *Feingold*, 454 F.3d at 1010.  And it does not allege, in word or substance, that Dr. Carozza committed the "much greater offense of acting as a drug 'pusher.'" *Moore*, 423 U.S. at 138.

Rather, it is clear from the indictment that the government is prosecuting Dr. Carozza solely because of the *manner* in which he prescribed controlled medications—via the Internet based on online questionnaires.  According to the indictment, Dr. Carozza violated the CSA by "purport[ing] to review    . . . on-line questionnaires and approv[ing] a prescription for the Controlled Substances requested by the customers."  Indictment ¶ 3.  The charged offense is simply and exclusively that Dr. Carozza failed to "physically examine or obtain a complete medical history" from his patients before he issued prescriptions online. *Id.*[7]

---

[7] In this sense, this case is unique.  Whereas courts have sometimes looked to a doctor's prescribing activity as *evidence* that the physician violated the CSA, *see*, *e.g.*, *United States v. Johnson*, 831 F.2d 124, 126-27 (6th Cir. 1987) (physician performed "perfunctory exams" at clinic where patients were "entitled" to prescriptions as part of visit and defendant signed blank prescriptions, among other misconduct); *United States v. Smurthwaite*, 590 F.2d 889, 890 (10th Cir. 1979) (defendant failed to perform physical examinations or take medical histories and knew purchasers were using pills for parties and not medical purposes); *United States v. Roya*, 574 F.2d 386, 389 (7th Cir. 1978) (defendant physician had no examining equipment, took no examinations, took no medical histories, and wrote prescriptions to third parties to skirt laws), Dr. Carozza is aware of no other cases where the manner of prescribing was itself the alleged violation.  Instead, as discussed above, those cases all involve allegations that the defendant
(footnote continued)

Case No. CR-10-0642 CRB
MOTION TO DISMISS

As the litany of cases addressing physicians' criminal liability demonstrates, this theory, even if proven, does not constitute the offense of distributing drugs in violation of the Controlled Substances Act.  Absent allegations that Dr. Carozza abandoned his professional judgment in favor of indiscriminate drug "pushing," the government cannot prosecute him based solely on disagreement with the way he carried out his practice.  *See Polychron*, 841 F.2d at 834 (holding that dismissal is appropriate where facts alleged fail to state an offense).

As a policy matter, the government can certainly prefer that prescriptions be written face-to-face.  Indeed, at the time of Dr. Carozza's alleged conduct, medical professionals as well as legislators were debating the benefits and drawbacks of Internet prescriptions.  *See* Patrick J. Egan, *Internet Pharmacy: Gray Area With Big Profit and High Risks*, The Champion 32 (Dec. 2005) (noting that "[t]here are several societal factors that vitiate in favor of such practices, including access to lower income patients").  The very existence of this debate, however, underscores the absence of criminal wrongdoing.  *See Gonzales*, 546 U.S. at 267 (finding no prosecutable offense where the practice of issue "has been the subject of an 'earnest and profound debate' across the country") (quoting *Washington v. Glucksberg*, 521 U.S. 702, 735 (1997)).  During the time period when Dr. Carozza is alleged to have written online prescriptions without

---

physicians acted as drug dealer.  *See, e.g., Feingold*, 454 F.3d at 1004-05 (physician distributed drugs in resale quantities in exchange for house painting); *Rosenberg*, 515 F.2d at 192 (physician prescribed drugs to undercover agents who stated they had no medical need but just wanted a "safer source" for their drugs); *United States v. Kaplan*, 895 F.2d 618, 619-20 (9th Cir. 1990) (physician committed health insurance fraud and exchanged prescriptions for marijuana); *United States v. Hayes*, 794 F.2d 1348, 1350 (9th Cir. 1986) (physician prescribed drugs to narcotic addicts over three-year period).  *See also United States v. Polan*, 970 F.2d 1280, 1281-82 (3d Cir. 1992) (physician was paid by third party to prescribe oxycodone to individuals for third party to resell or barter for sexual favors); *United States v. Larson*, 722 F.2d 139, 141 (5th Cir. 1983) (physician exchanged drugs for camera equipment); *United States v. Hooker*, 541 F.2d 300, 301-04 (1st Cir. 1976) (physician used self-described "creative writing act" to grant requests for prescriptions for "reds," "bombers," and "uppers" so patients could get "high"); *United States v. Collier*, 478 F.2d 268, 274 (5th Cir. 1973) (CSA "bars only activities outside the physician's professional practice, where a physician acts, in essence, as a 'pusher'").

1   an in-person examination, it was by no means clear that this conduct was unprofessional.  *A*

2   *fortiori*, the conduct could not have been criminal.

3          In any event, the question for this Court is one of law, not of policy: In the absence of an

4   express statutory prohibition, can a physician be criminally prosecuted based on the manner in

5   which he exercises his professional medical judgment to issue prescriptions to his patients?  At the

6   time of Dr. Carozza's alleged conduct, the answer was emphatically no.  *See infra* Point III(B).

7   Accordingly, the indictment fails to state an offense, and the charges against Dr. Carozza should

8   be dismissed.

9   **II.    THE INDICTMENT SHOULD BE DISMISSED BECAUSE IT IMPERMISSIBLY**
        **INTRUDES ON THE STATES' EXCLUSIVE PROVINCE TO REGULATE THE**
10       **PRACTICE OF MEDICINE**

11         In charging Dr. Carozza under the Controlled Substances Act, the government has far

12  exceeded the bounds of federalism.  Regulation of the practice of medicine is indisputably a matter

13  within the core of the States' exercise of their police powers.  *See Whalen v. Roe*, 429 U.S. 589,

14  603 n.30 (1977) (acknowledging states' broad police powers to regulate the administration of

15  drugs by health professionals).[8]  Accordingly, courts have consistently declined to interpret the

16  CSA and its implementing regulations as granting the federal government the authority to regulate

17  the manner in which licensed doctors practice medicine.  Rather, this is a matter left to state

18  licensing boards and the common law of medical malpractice.

19         The doctor-patient relationship, in particular, "is an area that falls squarely within the

20  states' traditional police powers."  *Conant*, 309 F.3d at 647 (Kozinski, J., concurring).  Pursuant to

21  these powers, state medical boards regulate the practice of medicine by licensing, investigating,

22  _____

23         [8] *See also Robinson v. California*, 370 U.S. 660, 664 (1962) (recognizing the unquestioned
    authority of the State to exercise its police power to regulate drug prescriptions); *Barsky v. Bd. Of*
24  *Regents*, 347 U.S. 442, 449 (1954) ("It is elemental that a state has broad power to establish and
    enforce standards of conduct within its borders relative to the health of everyone there.  It is a vital
25  part of a state's police power."); *Linder v. United States*, 268 U.S. 5, 18 (1925) ("Obviously, direct
    control of medical practice in the states is beyond the power of the federal government."); *Conant*
26  *v. Walters*, 309 F.3d 629, 639 (9th Cir. 2002) (explaining that "principles of federalism … have
    left states as the primary regulators of [medical] professional conduct").
27

28

1  and disciplining physicians.  *See, e.g.*, Cal. Bus. & Prof. Code § 2004 (Deering 2010); N.J. Stat.

2  Ann. §§ 45:9-1, *et seq.*; N.Y. Educ. Law §§ 6522-24 (Consol. 2010).  States also hold responsible

3  those doctors who violate professional norms through principles of common law malpractice.  *See*

4  Cal. Civ. Proc. Code § 340.5 (Deering 2010) (defining cause of action for medical malpractice in

5  statute of limitations provision).

6       Given these bedrock principles of federalism, courts do not lightly permit federal officials

7  to tread upon the province of the States.  See *New York Dep't of Soc. Servs. v. Dublino*, 413 U.S.

8  405, 413 (1973) ("It will not be presumed that a federal statute was intended to supersede the

9  exercise of the power of the state unless there is a clear manifestation of intention to do so.  The

10  exercise of federal supremacy is not lightly to be presumed.") (quoting *Schwartz v. Texas*, 344

11  U.S. 199, 202-203 (1952)).  This is particularly true in the context of criminal prosecutions, and

12  even more so where Congress has not spoken clearly about the particular practice at issue.  *See,*

13  *e.g.*, *Cleveland v. United States*, 531 U.S. 12, 25 (2000) (stating that "unless Congress conveys its

14  purpose clearly, it will not be deemed to have significantly changed the federal-state balance in the

15  prosecution of crimes") (citation and internal quotes omitted).

16       Courts have repeatedly applied these tenets specifically to the Controlled Substances Act.

17  Thus, the Supreme Court has recognized that the CSA "explicitly contemplates a role for the

18  States in regulating controlled substances."  *Gonzales*, 546 U.S. at 251.[9]  In *Gonzales*, the

19  Supreme Court considered whether the Attorney General had the authority to determine that

20  physician-assisted suicide was not medically justifiable anywhere in the country.  The Supreme

21

22  _____

23      [9] Specifically, as the Supreme Court emphasized in *Gonzales*, the CSA's pre-emption provisions made clear that the statute was not intended to and did not displace the States' general

24  regulation of medical practice.  546 U.S. at 270.  Rather, the Court held that 21 U.S.C. § 903 makes clear that Congress did not intend to "occupy the field" unless there was a "positive

25  conflict" between state and federal law, such that "the two cannot consistently stand together."  *Id.* at 251.  Here, no such conflict exists; rather, at the time of the conduct alleged in the indictment—

26  November 2004 to December 2006, *see* Indictment ¶ 33—Congress had not spoken with respect to whether doctors were permitted to issue prescriptions over the Internet without a prior in-person

27  exam.

28

Case No. CR-10-0642 CRB
MOTION TO DISMISS

1    Court held that he did not.  According to the Court, the CSA "manifests no intent to regulate the

2    practice of medicine generally …[which is] understandable given the structure and limitations of

3    federalism." *Id.* at 270.  The Court expressly rejected the Government's argument that the CSA's

4    "registration" and "control" provisions—pursuant to which the Attorney General can license and

5    revoke the licenses of physicians to prescribe drugs—impliedly delegated to the Attorney General

6    the power "to effect a radical shift of authority from the States to the Federal Government to

7    define general standards of medical practice in every locality." *Id.* at 275.  The "text and structure

8    of the CSA," concluded the Court, "show that Congress did not have this far-reaching intent to

9    alter the federal-state balance and the congressional role in maintaining it." *Id.*

10          Notwithstanding this unambiguous rejection of the federal executive's power to implement

11   national standards of medical care, the government here attempts, through its own interpretation of

12   21 C.F.R. § 1306.04, to usurp the States' authority to regulate medical practice.  Specifically, by

13   defining § 1306.04(a) to require an in-person evaluation, the government has arrogated the power

14   to resolve the nuanced and difficult question whether acceptable medical practice includes

15   issuance of a prescription over the Internet on the basis of a written questionnaire.  Moreover, the

16   government claims this power in a context where Congress had not yet spoken clearly at the time

17   of the physician's conduct—and in the course of a putative criminal prosecution, where the law

18   requires that Congress speak especially clearly before charges can properly be filed.  *See*

19   *Cleveland*, 531 U.S. at 25; *see also Gonzales*, 546 U.S. at 262.  This assertion of federal authority

20   over a quintessentially medical judgment in the face of congressional silence is inconsistent not

21   only with *Cleveland* and *Gonzales*, but with fundamental notions of federalism.

22          In sum, while the federal government can prosecute doctors for being drug dealers, *see*

23   *supra* Point I(B)(1), it cannot use the power of criminal prosecution to enforce its view of what is

24   medically appropriate in the absence of an explicit statutory prohibition.  Absent that legislative

25   command, which was here missing at the time of the actions in question, courts may not permit the

26   government to intrude so far into a domain appropriately reserved for the States.  As the

27   prosecution of Dr. Carozza represents an impermissible attempt to federalize a standard of

28   appropriate medical conduct, the indictment should be dismissed.

III. **THE INDICTMENT SHOULD BE DISMISSED BECAUSE DR. CAROZZA'S ALLEGED CONDUCT WAS NOT PROHIBITED UNTIL PASSAGE OF THE RYAN HAIGHT ACT IN 2008**

The indictment is deficient for another reason as well: the charged conduct did not become criminal until Congress passed the Ryan Haight Online Pharmacy Consumer Protection Act ("Ryan Haight Act") in October 2008.  Fundamental rules of statutory construction demonstrate unequivocally that Congress understood the Ryan Haight Act to create a new offense by requiring an in-person examination prior to the issuance of any online prescription.  Because this offense did not exist at the time of Dr. Carozza's conduct, the indictment charging the offense violates the Constitution's *Ex Post Facto* Clause and must therefore be dismissed.

A. **The *Ex Post Facto* Clause Bars Retroactive Application of Laws Creating New Offenses**

The *Ex Post Facto* Clause of the United States Constitution states that "[n]o . . . ex post facto Law shall be passed."  U.S. Const. Art. I, § 9, cl. 3.  As interpreted by the Supreme Court, this clause precludes the government from "enacting laws with certain retroactive effects." *Stogner v. California*, 539 U.S. 607, 610 (2003); *see also Carmell v. Texas*, 529 U.S. 513, 522 (2000) (retroactive application of new rule of evidence making it easier to convict was *ex post facto* violation); *Miller v. Florida*, 482 U.S. 423, 435-36 (1987) (finding *ex post facto* violation in retroactive application of new state sentencing guidelines).  In its most classic formulation, the *Ex Post Facto* Clause applies to "[e]very law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action."  *Calder v. Bull*, 3 Dall. 386, 391 (1798).

Significantly, the *Ex Post Facto* Clause bars not only laws that create brand new offenses, but also laws, regulations, and legislative interpretations that "retroactively alter the definition of crimes" already on the books.  *California Dep't of Corrections v. Morales*, 514 U.S. 499, 504 (1995); *see also United States v. Juvenile Male*, 819 F.2d 468, 472 (4th Cir. 1987) (holding that retroactive application of statutory amendment authorizing prosecution of juveniles as adults violated *Ex Post Facto* Clause); *United States v. Al Safarini*, 25 F. Supp. 2d 191, 199 (D.D.C. 2003) (holding that retroactive application of AEDPA would violate *Ex Post Facto* Clause by

redefining offenses eligible for the death penalty). By ensuring that the meaning of laws cannot be changed after the fact to ensnare completed conduct, the *Ex Post Facto* Clause functions as a bulwark against arbitrary enforcement and a guarantor of liberty. *See Stogner*, 539 U.S. at 609 (stating that *Ex Post Facto* Clause "protects liberty by preventing governments from enacting statutes with 'manifestly unjust and oppressive retroactive effects'") (citation omitted); *Carmell*, 529 U.S. at 532 ("In short, the *Ex Post Facto* Clause was designed as 'an additional bulwark in favour of the personal security of the subject,' to protect against 'the favorite and most formidable instruments of tyranny. . . .'") (citations omitted).

Protection against retroactive application of new laws is also afforded by the Due Process Clause. *See Bouie v. City of Columbia*, 378 U.S. 347 (1964). Where the law does not clearly prohibit a defendant's conduct at the time of its commission, prosecution pursuant to a later enacted provision violates fundamental requirements of fair notice. *See Webster v. Woodford*, 369 F.3d 1062, 1070 (9th Cir. 2004) ("The principle underlying *Bouie* and the later cases is that due process forbids the imposition of criminal penalties against a defendant who had no fair warning that his conduct violated the law.") (citation and internal quotes omitted).

**B.     The Ryan Haight Act Created a New Offense**

Prior to 2008 there was no statute, regulation, or legislative interpretation that required Dr. Carozza—or any other physician—to conduct an in-person examination before issuing a prescription for a controlled medication. As the Drug Enforcement Administration's Deputy Director of Enforcement Operations remarked in 2005, the DEA faced "continuing challenges" at that time in applying existing laws to online prescriptions because "there exist[ed] no statutory definition specifically outlining what constitutes a valid 'doctor/patient' relationship." *Safety of Imported Pharmaceuticals: Strengthening Efforts to Combat the Sales of Controlled Substances Over the Internet: Hearing Before the Subcomm. on Oversight and Investigations of the House Comm. on Energy & Commerce*, 109th Cong. 106 (2005) (statement of Joseph Rannazzisi, Deputy Director, DEA Office of Enforcement Operations). In response to this concern, Congress undertook to craft legislation defining the parameters of valid Internet prescriptions.

The Ryan Haight Online Pharmacy Consumer Protection Act was the product of this effort.  Enacted on October 15, 2008, the purpose of the Ryan Haight Act was "to amend the Controlled Substances Act to prohibit the delivery, distribution, or dispensing of controlled substances over the Internet without a valid prescription."  H.R. Rep. No. 110-869, pt. 1, at 11 (2008).  Section 309 of the Ryan Haight Act defined a "valid prescription" as one "issued for a legitimate medical purpose in the usual course of professional practice by a practitioner *who has conducted at least one in-person medical evaluation of the patient.*"  21 U.S.C. §§ 829(e)(1) & 829(e)(2)(A) (emphasis added).  Until the passage of this law, Congress had never before prohibited the conduct that is specifically alleged in the government's indictment.[10]

An examination of the legislative history leaves no question but that Congress understood the Ryan Haight Act to create a new legal requirement.  The Congressional Budget Office noted that the Act would "establish *new offenses*" and thereby enable the government "to pursue cases *that it otherwise would not able to prosecute.*"  H.R. Rep. No. 110-869, pt. 1, at 13-14 (2008) (emphasis added).  Similarly, in his opening remarks to the House Subcommittee on Crime, Terrorism, and Homeland Security during a hearing to consider the Ryan Haight legislation, Chairman Robert C. Scott described the bill as "creat[ing] a *new crime* that makes it unlawful for any person to knowingly or intentionally deliver, distribute or dispense a controlled substance over the Internet" absent a prior in-person evaluation.  *Online Pharmacies and the Problem of Internet Drug Abuse: Hearing Before the Subcomm. on Crime, Terrorism and Homeland Security of the*

---

[10] As late as July 2007, the DEA continued to believe that the law did not require a physician to conduct an in-person examination prior to issuing a prescription online.  At that time, DEA Deputy Director Joseph Rannazzisi sent a form letter to pharmacy registrants noting that "[t]he illegal sale of controlled substances via the Internet poses a serious threat to the public health and safety."  The letter went on to refer the reader to the implementing regulations appurtenant to the Controlled Substances Act.  Although the letter noted specifically that all patients "must have a prescription issued for a legitimate medical purpose by a practitioner acting in the usual course of professional practice," it said absolutely nothing about an in-person evaluation requirement.  Letter from J. Rannazzisi to Pharmacy Registrant (July 31, 2007).

1   *House Comm. on the Judiciary* [hereinafter, *Online Pharmacies Hearing*], 110th Cong. 1-2 (2008)

2   (statement of Rep. Robert C. Scott, Chairman) (emphasis added).

3       Testifying before Chairman Scott's subcommittee in June 2008, DEA Deputy Director

4   Joseph Rannazzisi reinforced the novelty of the new legislation.  Asked to explain why the Ryan

5   Haight bill was needed "if pharmacies and physicians are already subject to DEA registration and

6   State licensure," Mr. Rannazzisi responded that the bill "creates a definition for what a valid

7   prescription is.  It basically sets out guidelines for what a doctor is responsible for."  Mr.

8   Rannazzisi also denied that existing enforcement tools were sufficient, arguing that the effects of

9   the bill would include "the establishment of what a valid doctor-patient relationship is, what a

10  valid prescription is.  That is very important; [it] *puts everybody on notice that this is what is*

11  *expected*."  *Online Pharmacies Hearing*, 110th Cong. 10, 71-78 (2008) (emphasis added).

12      Finally, the sponsor of the Ryan Haight Act in the Senate, Senator Jeff Sessions, remarked

13  in his comments on the chamber floor that the Act "would go a long way in addressing the

14  concerns expressed by Attorney General Gonzales by reining in a practice *that has gone*

15  *unregulated* for far too long."  110 Cong. Rec. S3715 (daily ed. March 23, 2007) (statement of

16  Sen. Sessions) (emphasis added).  Senator Patrick Leahy echoed this sentiment, noting that the Act

17  would "*fill a gap* in existing law" by requiring in-person examinations prior to issuance of online

18  prescriptions.  110 Cong. Rec. S10,184 (daily ed. Sept. 30, 2008) (statement of Sen. Leahy)

19  (emphasis added).

20      Viewed in historical context, therefore, there can be no serious question that the Ryan

21  Haight Act changed the law by requiring that a physician conduct a face-to-face examination

22  before issuing an online prescription.  Nonetheless, the government maintains in its opposition to

23  defendant Arnold's motion to dismiss that the Ryan Haight Act "simply clarified the CSA's

24  existing application in light of new technology."  Opp'n to Arnold Mtn. to Dismiss, at 13.  Indeed,

25  the government urges this Court to accept that Congress did no more than "confirm that the CSA

26  prohibits" the alleged conduct.  *Id.*

27      The government's interpretation is at odds with the fundamental canon of statutory

28  construction that legislators do not act for no reason.  *Estate of Bell v. Comm'r*, 928 F.2d 901, 904

Case No. CR-10-0642 CRB

MOTION TO DISMISS

1  (9th Cir. 1991) ("Congress is presumed to act intentionally and purposely when it includes

2  language in one section but omits it in another."); *accord Rodriguez v. United States*, 480 U.S.

3  522, 525 (1987) (noting "it is generally presumed that Congress acts intentionally and purposely in

4  the disparate inclusion or exclusion" of language) (citation omitted).  Rather, "when Congress acts

5  to amend a statute, we presume it intends its amendment to have real and substantial effect." *Intel*

6  *Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 258-59 (2004) (quoting *Stone v. INS*, 514

7  U.S. 386, 397 (1995) ("The reasonable construction is that the amendment was enacted … not just

8  to state an already existing rule.")).  Indeed, it is axiomatic that "when Congress alters the words

9  of a statute, it must intend to change the statute's meaning." *United States v. Wilson*, 503 U.S.

10  333, 336 (1992); *see also Russello v. United States*, 464 U.S. 16, 23-24 (1983).  The government's

11  suggestion that the Ryan Haight Act merely "confirmed" the preexisting state of the law cannot be

12  squared with this long-standing rule.[11]

13          Contrary to the government's suggestion, therefore, the legislative history of the Ryan

14  Haight Act does not evince an intention to enact "minor, unexplained changes in phraseology" of

15  the sort that courts generally assume are "not intended to alter the statute's scope." *Walters v.*

16  *Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 318 (1985).  Rather, Congress's intent to

17  criminalize the alleged conduct for the first time is manifest.  Under these circumstances, the CSA

18  cannot be interpreted to have prohibited Dr. Carozza's alleged conduct nearly two years prior to

19  passage of the Act.

20

21

22          _____

23          [11] The government's interpretation of the Ryan Haight Act also violates the canon that a
statute must be construed "so as to avoid rendering superfluous" any of its language.  *Astoria Fed.*

24  *Savs. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991); *see also Negonsott v. Samuels*, 507
U.S. 99, 106 (1993) (interpreting statute so as to give effect to "every clause and word"); *Moskal*

25  *v. United States*, 498 U.S. 103, 109-111 (1990) (employing "established principle that a court
should 'give effect, if possible, to every clause and word of a statute'") (citation omitted).

26  Application of this canon "should be heightened when the words describe an element of a criminal
offense."  *Ratzlaf v. United States*, 510 U.S. 135, 140-41 (1994).  In the government's view, the

27  revisions to the CSA effected by the Ryan Haight Act were effectively unnecessary.

28

### C.   Prosecuting Dr. Carozza For Conduct Criminalized By the Ryan Haight Act Violates the *Ex Post Facto* Clause

Given that the Ryan Haight Act created a new offense, the indictment of Dr. Carozza violates the *Ex Post Facto* Clause.  The government has charged Dr. Carozza, in substance, with violating the CSA based on alleged prescriptions that were not issued for a legitimate medical purpose in the usual course of professional practice by a practitioner who conducted at least one in-person medical evaluation of the patient.  Indictment ¶¶ 2-3.  This is *precisely* what the Ryan Haight Act forbids: a valid prescription, according to that Act, is one "issued for a legitimate medical purpose in the course of professional practice by a practitioner who has conducted at least one in-person medical evaluation of the patient."  21 U.S.C. § 829(e)(2)(A).

According to the government, this identity between the indictment and the language of the Ryan Haight Act is of no constitutional moment because the indictment does not charge Dr. Carozza with a violation of the Ryan Haight Act *per se*.  Gov't Opp'n to Arnold Mtn. to Dismiss at 11-14.  Rather, the government contends that Dr. Carozza is charged with violating the Controlled Substances Act as it existed *before* the Ryan Haight Act's enactment.  *Id.*  The problem, of course, is that stripped of the amendments effected by the Ryan Haight Act, the CSA does not require an in-person examination as a condition of an online prescription.  Accordingly, the government's effort to avoid an *ex post facto* problem by disclaiming the Ryan Haight Act results in an indictment that fails to plead a crime.

More fundamentally, the *Ex Post Facto* Clause is concerned with the creation of new offenses.  *See Calder*, 3 Dall. at 391.  Here, the offense charged is manifest from the indictment: issuing online prescriptions without a prior in-person exam.  Because the Ryan Haight Act created this offense after Dr. Carozza's alleged conduct was complete, Dr. Carozza's prosecution offends his constitutional rights.  *Id.*  Accordingly, the indictment should be dismissed.

///

///

///

///

Case No. CR-10-0642 CRB
MOTION TO DISMISS

1

## Conclusion

2          For the reasons stated, Dr. Carozza respectfully urges the Court to grant his motion and

3    dismiss the indictment against him.

4

5    DATED:  November 17, 2010                    Respectfully submitted,

6

7
                                                 By   /s/
8                                                     Josh A. Cohen
                                                     Attorney for JOSEPH CAROZZA
9

10

11
                                                 By   /s/
12                                                    Lawrence S. Lustberg
                                                     Attorney for JOSEPH CAROZZA
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28