Josh A. Cohen (SBN 217853)
Nicole Howell Neubert (SBN 246078)
CLARENCE DYER & COHEN LLP
899 Ellis Street
San Francisco, CA 941109
Tel: (415) 749-1800
Fax: (415) 749-1694
jcohen@clarencedyer.com
nhneubert@clarencedyer.com

Attorneys for Defendant JOSEPH CAROZZA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>CHRISTOPHER NAPOLI et al.,<br><br>        Defendants. | CASE NO. CR-10-0642 CRB<br><br>**DEFENDANT JOSEPH CAROZZA'S SENTENCING MEMORANDUM**<br><br>Sentencing Date:   March 26, 2013 |

# TABLE OF CONTENTS

INTRODUCTION ………………………………………………………………….......1

OBJECTIONS TO PRESENTENCE REPORT ………………………………………..2

ARGUMENT ……………………………………………………………………….....2

I.    Dr. Carozza's Medical Career Belies The Government's Suggestion That He Was Indifferent To The Welfare Of His Patients …………………………………2

II.    This Case Falls Far Outside The Heartland of Drug Trafficking Crimes ………....5

III.    The 60-Month Sentence Recommended By the Government Would Be Vastly Disproportionate To Sentences Imposed On Other Similarly Situated Individuals Nationwide ……………………………………..……………………...8

A.    Disparity Vis-à-Vis Other Physicians Prosecuted For Online Prescribing…………………………………………………………9

B.    Disparity Vis-à-Vis Other Safescripts Doctors …………………………...10

C.    Disparity Vis-à-Vis Other Physicians ………………………………….12

D.    Disparity Vis-à-Vis Dr. Carozza's Codefendants ………………………...14

IV.    The Court Should Sentence Dr. Carozza To Probation …………………………14

A.    Properly Computed, Dr. Carozza's Offense Level Is 20 ………………...15

1.    The Court Should Not Upwardly Depart Based On Drug Quantity ……………………………………………………..15

2.    The Abuse-of-Trust Enhancement Does Not Apply ……………..17

3.    Dr. Carozza Should Receive The Two-Level "Safety Valve" Adjustment ……………………………………………………19

B.    The Court Should Vary Downward To Probation ………………………..21

CONCLUSION ………………………………………………………………………23

**INTRODUCTION**

Dr. Joseph Carozza stands convicted of federal drug trafficking based on prescriptions he wrote that purportedly fell outside the "usual course of professional medical practice."  According to the government's theory at trial, the prescriptions violated federal criminal law not because the drugs had no approved medical use or were issued without a license, but because they were issued in the absence of a doctor-patient relationship characterized by a face-to-face examination and post-prescription care.

The validity of Dr. Carozza's conviction will be tested on appeal by the same Circuit Court that held a physician does not become a criminal unless he so completely abdicates any semblance of medical judgment as to cease being a doctor at all.  The Court of Appeals will decide, *inter alia*, whether the conviction can be squared with core notions of federalism, the *Ex Post Facto* clause, and the reality that countless physicians prescribe controlled substances based on medical questionnaires and patients' self-reports in traditional, office-based settings.

First, however, this Court must decide what punishment to impose on a forty-year veteran of the medical profession – a doctor whose credits include the development of an intensive-care unit in rural West Virginia, a term as Executive Director of the National Burn Foundation, and volunteer stints at Ground Zero and in post-Katrina New Orleans.  The Court must determine whether the crime of prescribing online, which did not even exist when the Sentencing Commission promulgated the Sentencing Guidelines, falls anywhere near the heartland of § 2D1.1.  And the Court must decide what, if anything, distinguishes Dr. Carozza from the multitude of other physicians who engaged in precisely the same conduct but received probationary terms or were never prosecuted at all.

Dr. Carozza accepts, as he must, the jury's finding that he violated the Controlled Substances Act.  It does not follow, however, that Dr. Carozza should be compared for sentencing purposes to a back-alley slinger of heroin or crack cocaine.  Rather, the Court should compare Dr. Carozza to other doctors who engaged in the same or similar conduct.  Taking into account the

Case No. CR-10-0642 CRB
DEFENDANT CAROZZA'S SENTENCING MEMORANDUM

sentences imposed on such physicians – and the hordes of doctors who will never face prosecution at all – the Court should sentence Dr. Carozza to probation.

**OBJECTIONS TO PRESENTENCE REPORT**

As set forth more fully below, Dr. Carozza objects to the probation officer's calculation of the advisory sentencing range under the Sentencing Guidelines; to the officer's determination that there are no circumstances warranting a downward departure or variance from the properly computed range; and to the officer's recommendation that Dr. Carozza be imprisoned for the maximum term permitted by law.

In addition, paragraph 90 should be revised to reflect that Dr. Carozza's sister passed away on February 21, 2013.

**ARGUMENT**

**I.     Dr. Carozza's Medical Career Belies The Government's Suggestion That He Was Indifferent To The Welfare Of His Patients**

Having presided over a lengthy trial about his participation in Safescripts Online, the Court's impression of Dr. Carozza is necessarily highly skewed.  In reality, Dr. Carozza's association with Safescripts was atypical, short-lived, and far from representative of his approach to patient care.

As set forth in the presentence report, Dr. Carozza endured a hardscrabble upbringing at the hands of an alcoholic father in a cold-water flat in Brooklyn's notorious Bedford-Stuyvesant neighborhood.  PSR ¶¶ 89, 91.  Against all odds, Dr. Carozza earned a scholarship to Bishop Loughlin High School in Brooklyn, then worked his way through Hofstra University.  Like many American students, Dr. Carozza enrolled in medical school outside the United States, graduating from the Universidad Autónoma de Guadalajara in Mexico in 1975.[1]  He returned to the United

---

[1] One quarter of the physicians currently practicing in the United States received their medical degrees outside the country.  *See* Pauline W. Chen, *When the Doctor Doesn't Look Like You*, The New York Times (Aug. 12, 2010) ("Currently, [international medical school graduates] make up fully one-quarter of all practicing physicians, and although a majority are foreign-born, approximately 20 percent are American citizens who have chosen to go abroad . . . for medical
                (footnote continued)

States to complete his medical training, first at Drexel University's Hahneman Hospital in Philadelphia, then as an intern at Overlook Hospital in New Jersey, and finally as an anesthesiology resident at Columbia Presbyterian Medical Center in Manhattan.  PSR ¶ 103.

As Dr. Carozza's residency neared its conclusion, a faculty advisor suggested that he and his fellow residents consider private practice in an underserved region of the country.  Dr. Carozza took that advice to heart.  In 1979, he arrived at Raleigh General Hospital in Beckley, West Virginia, a town of 18,000 that proudly calls itself the "Gateway to Southern West Virginia."  When Dr. Carozza arrived, Raleigh General was a small regional medical center with no qualified anesthesiology staff, no physician in charge of respiratory therapy, and no surgical ICU.  Over the next nine years, Dr. Carozza addressed all of those needs.  In his capacity as Chairman of the Department of Anesthesiology, he directed the respiratory therapy program and also oversaw the design, development, and construction of a state-of-the-art surgical ICU.

When he returned to New York, Dr. Carozza operated a weight loss clinic in Queens before starting a medical partnership in midtown Manhattan devoted to the treatment of terminally ill cancer patients.  Over the next several years, Dr. Carozza tended to his practice while pursuing entrepreneurial opportunities in the medical sciences.  In 2002, he founded Cytogel Pharma, a company devoted to the development and licensing of analgesic medications.

Throughout his medical and entrepreneurial careers, Dr. Carozza demonstrated a consistent commitment to helping those in need.  When the Twin Towers fell on September 11, 2001, Dr. Carozza responded to Ground Zero to provide medical assistance.  PSR ¶ 98.  When Hurricane Katrina struck in 2005, Dr. Carozza spent several weeks in New Orleans helping the victims of the disaster.  As fate would have it, when Hurricane Sandy devastated the New York region during the fifth week of trial in this case, Dr. Carozza received several phone calls from aid organizers while this Court was in session enlisting his help with the relief effort.

---

school."); *see also* American Medical Ass'n, *Physician Characteristics and Distribution in the U.S.* (2012 ed.).

In addition, Dr. Carozza served for several years as a trustee of the Burn Foundation, a nonprofit organization that raises funds for burn treatment centers in the Northeast.  PSR ¶ 98. From 2001 to 2003, Dr. Carozza was the foundation's Executive Director.  In this role, Dr. Carozza coordinated an extensive network of *pro bono* transportation providers – planes, helicopters, and ambulance services – to ensure prompt treatment of serious burn victims.

Dr. Carozza has also been a long-time supporter of charitable organizations devoted to research and treatment of medical conditions.  For example, Dr. Carozza served as the chairperson of a fundraising campaign for the United Cerebral Palsy Association of Nassau County in 1996. In this capacity, Dr. Carozza persuaded Muhammad Ali to visit the Association, meet the winners of a teen essay contest, and accept an award at a Champion of Courage award dinner.  Prior to this event, Mr. Ali had been reticent to call attention to his own disorder by engaging in outreach on behalf of medical organizations.  Dr. Carozza was instrumental in changing his mind, an achievement that increased annual contributions to the Association by $150,000.

To this day, Dr. Carozza spends his major holidays delivering meals to the homes of the ill and the elderly.  He hewed to this tradition as recently as Thanksgiving 2012, less than one week after returning to a waterlogged home following this marathon trial.

Finally, Dr. Carozza has been an unrelenting Samaritan.  As set forth in a letter submitted to the Court by Dr. Carozza's longtime companion, Susan Byram, Dr. Carozza has responded on countless occasions to roadside emergencies and other random medical events:

> One 19 year old boy I remember, was thrown through the windshield of a SUV because he wasn't wearing a seat belt.  If Joe hadn't stopped when he did, the boy would have died.  Joe used CPR to keep him alive until EMS arrived and followed his recovery for months afterward.  It took the boy a very long time to recover and Joe was often called by his parents for advice, which Joe was happy to provide.

Exhibit 1, at 1.  And,

> Joe once had an office across from Central Park in New York City and would often encounter the homeless who spent time sitting or lying on the benches outside of the park.  He would always stop, not only to give money to them, but also to see to medical problems that were obvious and could be readily helped by cleaning an injury or providing bandages.  I remember one time he encountered a woman shoeless with terrible sores on her feet.  He dressed the wounds and gave her antibiotics.  I found later, after discovering a pair of my sneakers missing, that he had given them to the homeless woman.

*Id.* To quote Ms. Byram, "This is a man who has freely volunteered his time, medical knowledge and considerable charisma in helping people for as long as I have known him which is 32 years." *Id.*

Appended hereto as Exhibit 1 is a collection of letters from Dr. Carozza's friends and family, all whom attest to Dr. Carozza's generosity, warmth, and dedication to the medical profession and people in need.

Given this backdrop, it would be a grave error to judge Dr. Carozza on the basis of Safescripts alone.  The eleven months during which Dr. Carozza worked for Mr. Napoli were by no means representative of Dr. Carozza's medical career, nor were they indicative of a disregard for patient welfare.  To the contrary, Dr. Carozza has consistently demonstrated a sincere respect for the men and women he treats and the well-being of the community at large.

## II.     This Case Falls Far Outside the Heartland Of Drug Trafficking Crimes

Several months ago, the Court observed that "this [case] is way out of the ordinary of criminal cases."  RT 10 (Mar. 23, 2011).  "[I]t's not the traditional type of criminal prosecution that I've seen, at least."  *Id.*

The Court was absolutely right.  The drug "distributor" in this case held a license to distribute drugs.  The drugs he distributed were approved by the Food & Drug Administration as effective treatments for legitimate medical conditions.  In the overwhelming majority of instances, the patients who received the drugs completed medical questionnaires indicating they were appropriate candidates to receive them.[2]  In each of these respects, the conduct at issue was readily

---

[2] Notably, all of the patients whom the government called as witnesses at Dr. Carozza's trial testified that they sought the prescriptions they ordered to treat the conditions for which the drugs were approved.

1    distinguishable from the typical controlled substance offenses prosecuted in this Court.

2        The putative harm, too, was different.  All scheduled substances have, by definition, some

3    potential for addiction.  Yet any suggestion that a weight-loss medication like phentermine

4    presents the same health risks as heroin or methamphetamine would be wildly overstated.

5    Notwithstanding the government's apocalyptic warnings of overdose and death, in reality

6    "[p]hentermine has proven to be a safe, cost effective and highly successful medication."

7    American Society of Bariatric Physicians [ASBP], *Overweight and Obesity Evaluation and*

8    *Management* 3 (Nov. 2009), *available at* http://www.inlandempireweightloss.com/documents/

9    ASBPGuidelinesForOverweight And ObesityEvaluationManagement.pdf (citing CK Haddock et

10   al., *Pharmacotherapy for Obesity: A Quantitative Analysis of Four Decades of Published*

11   *Randomized Clinical Trials*, INT'L JOURNAL OF OBESITY AND RELATED METABOLIC DISORDERS

12   2002; 26(2): 262-73).[3]

13       The case is distinguishable as well in terms of the state of the law.  The law governing

14   most drug offenses is pellucid: It is *per se* illegal for anyone and everyone to distribute crack

15   cocaine.  Similarly, the law since 2009, when the Ryan Haight Act took effect, has categorically

16   prohibited the issuance of controlled substances by a physician without an in-person exam.  By

17   _____

18       [3] The federal government's own analysis of the risks of misuse or abuse of various
19   medications found that anorectics like phentermine yield one of the lowest rates of abuse, lower
     even than ibuprofen.  *See* ASBP at 3 (citing U.S. Dep't of Health and Human Services, Drug
20   Abuse Warning Report (2006)).  It is for precisely this reason that phentermine is widely
     prescribed for far longer periods than its FDA-approved label supports.  *See* Melinda Beck, *New*
21   *Diet Pills Offer Option to Off-Label Obesity Drugs*, THE WALL STREET JOURNAL, July 30, 2012
     ("Because they are potentially addictive, phentermine and the others are approved for short-term
22   use only.  'But all of us use it long-term,' says Dr. Kushner.  Dr. Hendricks, who says he has
     treated 15,000 patients with phentermine, alone and in combinations, over 23 years, says that
23   patients who keep taking it tend to maintain their weight loss."); Gina Rollins, *The Role of Drugs*
     *In Treating Obesity*, ACP [AMERICAN COLLEGE OF PHYSICIANS] INTERNIST, Feb. 2002 ("Some
24   physicians say they prescribe phentermine for more than three months – longer than the FDA-
     approved time frame – because patients simply need more time on the drug to lose weight.  Longer
25   treatment is possible, Dr. Johnson explained, because phentermine has a good safety record.  'It's
     been around for 40 years and appears to be nontoxic over a long period of time,' he said.").

26

27

28

1   contrast, at the time of the events in question, Dr. Carozza's conduct was governed by the

2   nebulous and highly subjective "outside-the-usual-course" standard.  Indeed, in late 2005, just as

3   Dr. Carozza was responding to Mr. Napoli's advertisement in *The New York Times*, senior DEA

4   officials were petitioning Congress for legislation that would prohibit precisely the conduct at

5   issue because then-existing laws did not explicitly do so.  *See*, *e.g.*, *Safety of Imported*

6   *Pharmaceuticals: Strengthening Efforts to Combat the Sales of Controlled Substances Over the*

7   *Internet*, Hearing Before the Subcomm. on Oversight and Investigations of the House Comm. on

8   Energy & Commerce, 109th Cong. 106 (Dec. 13, 2005) (statement of Joseph Rannazzisi, Deputy

9   Director, DEA Office of Enforcement Operations) (testifying that the DEA faced "continuing

10  challenges" in applying existing laws to online prescriptions because "there exists no statutory

11  definition specifically outlining what constitutes a valid 'doctor/patient' relationship").  Though

12  this Court has since ruled that a doctor can be convicted on a jury's determination that he acted

13  "outside the usual course of professional practice," the unsettled state of the law at the time of Dr.

14  Carozza's conduct significantly distinguishes it from a mine-run drug offense.

15      Dr. Carozza's case is further unusual insofar as his conduct was fully transparent to law

16  enforcement.  Quite unlike the typical drug dealer, Dr. Carozza's name, DEA registration number,

17  registered address, and cellular telephone number were affixed to every prescription that went out

18  under his name.[4]  Further distinguishing this case from the heartland, when the DEA sought to

19  interview Dr. Carozza, he met with the agents and told them *exactly* what he was doing.  *See*

20  Exhibit 2 (DEA report of interview of Dr. Carozza on August 8, 2006).  Notwithstanding Dr.

21  Carozza's candor – including his blunt admission that he was issuing as many as 300 to 400

22  prescriptions a day to patients he did not examine in person – the agents did not so much as warn

23  him that his conduct might run afoul of the law.  *See id.*

24

25  _____

26      [4] Notably, the evidence at trial strongly suggested that others logged into the Safescripts

27  back end and approved prescriptions under Dr. Carozza's name without his knowledge or consent.

28

Case No. CR-10-0642 CRB
DEFENDANT CAROZZA'S SENTENCING MEMORANDUM

1      Finally, it is a fair bet that Dr. Carozza's prosecution is among the first § 841 cases this

2   Court has ever encountered in which an alleged drug distributor voluntarily ceased his conduct

3   long before charges were filed.  Whatever the Court may think about the *bona fides* of the

4   declaratory judgment action that Dr. Carozza joined in Pennsylvania, it is an undisputed fact that

5   Dr. Carozza ceased prescribing for Safescripts Online immediately upon learning that the action

6   would be dismissed.  *See* RT 3588-89 (Nov. 5, 2013) (Testimony of C. Napoli) ("Q. But when you

7   told Dr. Carozza on November 10th, 2006, that the declaratory judgment action had been

8   dismissed, he told you he was out?  A. Correct.").  That was in November 2006, nearly *four years*

9   before the indictment in this case was returned.

10      For all of these reasons, Dr. Carozza's case bears scant resemblance to a run-of-the-mill

11   prosecution under Title 21.  As one of a handful of doctors singled out for prosecution based on

12   online prescriptions he wrote for FDA-approved medications before the Ryan Haight Act was

13   passed, Dr. Carozza should not be compared to the general population of drug offenders to whom

14   § 2D1.1 is addressed.

15  **III.   The 60-Month Sentence Recommended By the Government Would Be Vastly
           Disproportionate To Sentences Imposed On Similarly Situated Individuals**
16         **Nationwide**

17      Notwithstanding the palpable distinctions between this case and the heartland of federal

18   drug offenses, the government and the probation officer recommend the maximum sentence

19   permitted by law for Dr. Carozza's conduct.  This recommendation is unconscionable.  A sentence

20   of five years in prison would be vastly disproportionate to sentences imposed on physicians in

21   other online-pharmacy prosecutions across the country.  It would be disproportionate to sentences

22   imposed on others in this case, including the ringleaders of the conspiracies and defendants who

23   engaged in the conduct for far longer than Dr. Carozza and pocketed many multiples of what Dr.

24   Carozza earned.  What's more, the recommended sentence would create a gaping, inexplicable,

25   and profoundly unjust disparity vis-à-vis physicians who engaged in indistinguishable conduct but

26   were spared the government's wrath.

27

28

### A.      Disparity Vis-à-Vis Other Physicians Prosecuted For Online Prescribing

To date, it appears there have been 55 doctors sentenced in online-pharmacy cases nationwide.  *See* Exhibit 3.[5]  Although there is no evident rhyme or reason to the government's prosecutorial decisions, the government presumably culled these 55 from the much larger universe of doctors who engaged in similar conduct because, in the government's estimation, they are the most culpable offenders.

The average sentence imposed on these 55 doctors is 15.1 months in prison.  The median sentence is 12 months.  Twenty-four of the doctors – 44% – were sentenced to probation.

Moreover, a comparison between Dr. Carozza and the doctors who received substantial prison terms reveals that the latter engaged in far more egregious conduct.  For example, Dr. Juan Ibanez, sentenced to 51 months in the Middle District of Florida, created a business that sold more than 50 million hydrocodone pills over a period of four years on at least 13 different websites. Elaine Silvestrini, *Former Doctor Sentenced for Internet Drug Sales*, THE TAMPA TRIBUNE, Jan. 29, 2009.  Dr. Bill McArthur III, who received a sentence of 46 months in the Northern District of Texas, operated a company that contracted the services of several physicians, himself included, to prescribe oxycodone, and also personally laundered more than $1 million.  *See* DOJ Press Release, *Physician Pleads Not Guilty In Federal Court in Dallas to Conspiracy Charges*, Dec. 6. 2006, *available at* http://www.justice.gov/usao/txn/PressRel06/mcarthur_indict_pr.html.  And Dr. Christopher Tobin, sentenced to 36 months in the Middle District of Florida, signed a consent decree with a state licensing board specifically promising not to prescribe any medications for any person without a face-to-face exam, then proceeded to flout that decree repeatedly for a period of two years.  *See United States v. Christopher Tobin*, Case No. CR-08-0118 DDD (M.D. Fl.), Docket No. 911, at 20.

---

[5] This chart represents counsel's best effort to compile a comprehensive list of physicians sentenced in internet-pharmacy cases.  Although we have omitted no case of which we are aware, it is possible that other prosecutions exist that we were unable to locate.

1    Against this backdrop, the sentence recommended by probation cannot be reconciled with

2    § 3553's command to avoid unwarranted disparities.  *See* 18 U.S.C. § 3553(a)(6).  There is no

3    conceivable justification for sentencing Dr. Carozza to a prison term *four times* the average

4    imposed on doctors convicted of the same offense, or for giving Dr. Carozza the longest sentence

5    imposed by any court nationwide on a physician in an online-pharmacy case.  Nor is there any

6    reason to sentence Dr. Carozza more harshly than the 44% of sentenced doctors who received

7    probationary terms.  The Court should avoid unwarranted disparities by imposing a sentence in

8    line with those imposed on comparably situated defendants in comparable cases – specifically,

9    probation.

10              **B.        Disparity Vis-à-Vis Other Safescripts Doctors**

11    Dr. Carozza is the only physician named in the indictment in this case.  By no means,

12    however, is he the only physician to have participated in the charged conduct.  In Dr. Carozza's

13    trial alone, the Court heard testimony from one physician – Dr. John Wilkins – who wrote

14    prescriptions for Mr. Napoli before Dr. Carozza did, and there was considerable evidence

15    introduced about another physician – Dr. Alvin Oscar – who did exactly the same thing.  The

16    Pitcairn and United Mail conspiracies utilized their own physicians, none of whom is before this

17    Court for prosecution or sentencing.

18    In the months since the indictment was returned, the government has sought to rationalize

19    the disparate treatment accorded to physicians in this case by claiming that the other physicians

20    were motivated by financial duress and/or ceased writing prescriptions when visited by the DEA.

21    *See*, *e.g.*, RT 4603-04 (Nov. 13, 2012) (government closing argument) ("Now, Dr. Wilkins was

22    already working two jobs and he had seven kids to feed. . . . He was a doctor who needed some

23    extra cash.").  Neither of these rationales is compelling.  The suggestion that having many mouths

24    to feed somehow justifies or excuses criminal conduct is an odd one for the government to make;

25    certainly, it finds no support in the United States Attorneys Manual or the charging principles

26    generally adhered to by the executive branch.

27

28

Case No. CR-10-0642 CRB
DEFENDANT CAROZZA'S SENTENCING MEMORANDUM

1    That others stopped when visited by the DEA is a similarly specious explanation given the

2    evidence presented at trial.  The government called as witnesses the DEA diversion investigators

3    who visited Dr. Wilkins, Dr. Oscar, and Dr. Carozza.  The investigators who visited Dr. Wilkins

4    and Dr. Oscar testified that they told the doctors their conduct was illegal and should be stopped

5    immediately.  *See* RT 562 (Oct. 3, 2012) (Testimony of Investigator Rucker) ("Q.  And during that

6    interview . . . you specifically told Dr. Wilkins what he was doing was illegal?  A.  That's

7    correct."); RT 1069-70 (Oct. 9, 2012) (Testimony of Investigator Doubet) ("Q.  And while you

8    were at Dr. Oscar's residence, you told him that it was illegal to issue prescriptions without a DEA

9    license, right?  A.  It was explained to him, yes, sir.").  By contrast, the investigator who

10   interviewed Dr. Carozza, Richard Springer, said no such thing.  Although he and his partner spoke

11   with Dr. Carozza at length in the DEA office on Long Island on August 8, 2006, and although Dr.

12   Carozza was completely forthright concerning his conduct, neither Mr. Springer nor his partner

13   served Dr. Carozza with a suspension order or gave him any literature describing the DEA's

14   position that online prescribing was illegal.  RT 1546-47 (Oct. 11, 2012).  And while the agents

15   later placed a "hold" on Dr. Carozza's DEA license to prevent the license from renewing

16   automatically, they never informed Dr. Carozza that this undetectable action had been taken.  *Id.*

17   Accordingly, the different reactions of Doctors Wilkins, Oscar, and Carozza to the visits

18   from DEA can readily be explained by reference to the different messages that the DEA agents

19   conveyed.  Indeed, Dr. Carozza is alone among this group in having voluntarily terminated his

20   association with an online pharmacy *without* a DEA warning.

21   Needless to say, it is not for this Court to second-guess the government's charging

22   decisions.  When it comes time for sentencing, however, it is highly relevant that whereas the

23   government seeks the statutory maximum sentence for one doctor, others similarly situated were

24   allowed to skate scot-free.  As Judge Calabresi has observed, "the district court should not be

25   barred from considering the relevance of prosecutorial discretion in a particular case . . . .  In

26   particular, . . . we should not forget that there might be even greater disparities between a

27   defendant and other individuals who were not charged at all."  *United States v. Lynne Stewart*, 590

28

Case No. CR-10-0642 CRB
DEFENDANT CAROZZA'S SENTENCING MEMORANDUM

1    F.3d 93, 161-62 (2d Cir. 2009) (Calabresi, J., concurring).[6]  This Court should minimize the

2    effects of the inexplicable disparity between Dr. Carozza and his peers by imposing a noncustodial

3    sentence.

4         **C.    Disparity Vis-à-Vis Other Physicians**

5         There are at least two further layers of disparity created by the government's prosecution

6    of Dr. Carozza.  First, there were dozens of online pharmacies just like Safescripts operating in the

7    pre-Ryan Haight Act era.  Although some pharmacies dispensed with doctor review altogether,

8    many employed licensed physicians in precisely the capacity that Dr. Carozza fulfilled.  Many

9    such pharmacies and physicians have never been prosecuted.  While it is no defense to a crime that

10   others were doing it too, it taxes faith in our system of justice when the government makes pariahs

11   of a few while ignoring the deeds of many.

12        Second, the government has applied its "outside-the-usual-course" theory of prosecution in

13   a highly selective manner.  As this Court has construed it, the government's theory extends far

14   beyond online script-writers to all physicians whose conduct violates professional standards.  If, as

15   _____

16        [6] The entirety of Judge Calabresi's concurring opinion in the *Stewart* case is appended
     hereto as Exhibit 4.  Lynne Stewart, of course, was an attorney charged and convicted of providing
17   material aid to terrorists by passing messages to and from her client in jail.  In his concurrence to
     the majority opinion remanding the case for resentencing, Judge Calabresi called attention to the
18   "perhaps uncomfortable" fact that "Stewart does not appear to have been the only member of
     Abdel Rahman's legal team" to do what she did, yet none of the others were prosecuted for doing
19   it.  509 F.3d at 159.  Though finding nothing invidious or improper in the government's charging
     decision, Judge Calabresi noted "it does not follow that the alleged misconduct of [the others] . . .
20   is entirely irrelevant to Stewart and her sentence.  I think it possible that it *is* relevant, and I
     believe that usually only the district court is positioned to evaluate that relevance."  *Id.* at 159-60.
21   As Judge Calabresi observed, prosecutorial discretion may

22
          produce disparities in the way similarly situated people are treated, disparities that
23        our complex, Guidelines-with-district-court-discretion system has sought to
          minimize.  The district court's exercise of its sentencing discretion may provide
24        the only effective way to control and diminish unjustified disparities, without
          operating in the blunt fashion of selective prosecution judicial review.  It may
25        reduce improper differences in treatment, without impugning on the executive's
          obligation to enforce the law.
26

27   *Id.* at 160.

28

the government insists, Dr. Carozza was not prosecuted for failing to examine his patients in person,[7] it follows that even doctors who see their patients face-to-face are criminally liable when they issue prescriptions based on questionnaires or *pro forma* evaluations that fail to smoke out determined addicts.

The implications of this theory are sweeping.  By way of illustration, on February 3, 2013 *The New York Times* ran a front-page article about Richard Fee, an honors student, class president, and baseball star from Virginia Beach who became addicted to Adderall, a Schedule II controlled substance approved for the treatment of attention deficit disorder.  *See* Alan Schwarz, *Drowned in a Stream of Prescriptions*, THE NEW YORK TIMES, Feb. 3, 2013, at A1 (attached hereto as Exhibit 5).  Although Mr. Fee developed increasingly serious symptoms of addiction over time – symptoms that his parents noticed and repeatedly brought to the attention of his doctors – Mr. Fee was able to obtain and fill prescription after prescription through face-to-face interactions with licensed medical professionals.

Two days later, the *Times* published several Letters to the Editor remarking on the story.  One reader, a physician in New York, came to the doctors' defense.  "As an allergist and immunologist," he wrote, "I depend on a patient's history to make a diagnosis and prescribe treatment.  If a patient lies convincingly, then he or she will receive a false diagnosis and be treated improperly."  Letter from Daryl Altman to the Editor (Feb. 4, 2013), THE NEW YORK TIMES, Feb. 5, 2013 (attached as Exhibit 5).

In short, there is strong reason to believe that hundreds of medical professionals prescribe well outside the "usual course of professional practice" described by the government's experts.  Yet none of the nurses, internists, psychologists, or psychiatrists who cared for Mr. Fee will ever face federal prosecution, nor will the many other doctors just like them.  As such, the

---

[7] *See* RT 12 (Jan. 19, 2011) ("MS. AULT:  Your Honor, again, the defense keeps trying to limit us to this one fact that there was no face-to-face doctor/patient relationship.  And I keep reiterating: That is not our theory.")

1  government's selective pursuit of online prescribers leads to vastly disparate treatment of similarly

2  situated individuals for much the same conduct, *viz.*, prescribing on the basis of medical

3  questionnaires and patient self-reports, with little or no verification of the information provided

4  therein.  Absent a principled rationale for such differential treatment, the Court should impose a

5  sentence that narrows the resulting disparity.

6       **D.      Disparity Vis-à-Vis Dr. Carozza's Codefendants**

7           Finally, the 60-month sentence recommended by the government figures to be badly out of

8  step with the sentences the government is seeking for the other defendants in this case.  Dr.

9  Carozza is readily distinguishable from heavyweights like Mike Arnold, Chris Napoli, and Sal

10  Lamorte, all of whom built businesses, maintained them for extended periods of time, and reaped

11  millions of dollars as a result.  In particular, he deserves a far lesser sentence than Mr. Napoli, who

12  not only recruited Dr. Carozza and directed his activities, but also went to great lengths to lull him

13  (and others) into believing that the business model had been vetted and approved by counsel.

14                              *      *      *

15          In the final analysis, the Court is preparing to sentence Dr. Carozza not for drug

16  distribution, not for conspiracy, but for what this Court seems to perceive as dereliction of duty.

17  As such, the question for the Court is what sentence is sufficient but not greater than necessary to

18  punish Dr. Carozza for failing to act in the manner the Court expects a doctor to act.  To answer

19  this question, the Court cannot look to sentences imposed on drug dealers in mine-run cases.  At

20  the same time, it cannot ignore the many other doctors who were equally remiss but escaped

21  prosecution altogether.

22  **IV.   The Court Should Sentence Dr. Carozza To Probation**

23          Properly computed, Dr. Carozza's advisory sentencing range is far below the 60 months

24  requested by the government.  The Court should vary downward from the proper range to a term

25  of probation in Zone B or C.

26  ///

27  ///

28

**A.      Properly Computed, Dr. Carozza's Offense Level Is 20**

**1.      *The Court Should Not Upwardly Depart Based on Drug Quantity***

The government has proposed that the Court depart upward by four levels because the quantity of drugs prescribed by Dr. Carozza exceeded the maximum quantity described in the Guidelines' drug table.  According to the government, such a departure is justified by application note 26(B) to § 2D1.1 of the Guidelines, which observes that a departure "may be warranted if the drug quantity substantially exceeds the quantity for the highest offense level established for that particular controlled substance."

Although the Court can consider drug quantity as part of its holistic review of the § 3553(a) sentencing factors, the Court should reject, for several reasons, the government's request for an upward departure.  First, the Guidelines provide clear direction on how to compute the sentence in this case.  As the PSR acknowledges, the Guidelines direct the Court to convert the Schedule III and IV substances into their respective marijuana equivalents and add the results.  PSR ¶ 73.  The resulting total "shall not exceed 59.99 kilograms of marijuana."  *Id.*; *see* U.S.S.G. § 2D1.1 app. n. 10(E) (stating that "the combined equivalent weight of all Schedule III substances (except hydrocodone), Schedule IV substances (except flunitrazepam), and Schedule V substances shall not exceed 59.99 kilograms of marijuana").  This corresponds to an offense level of 20.  *Id.* § 2D1.1(c)(10) (setting offense level of 20 for 40 to 60 kilograms of marijuana).

In asking the Court to upwardly depart, the government proposes that the Court disregard the Sentencing Commission's determination that the maximum offense level for Schedule III and IV substances under a marijuana equivalency analysis is 20.  Had the Commission wished to permit a higher offense level for larger quantities, however, it could simply have removed (or raised) the cap.  Indeed, that is precisely what the Commission did for hydrocodone products after the Ryan Haight Act took effect in 2009.  *See* United States Sentencing Comm'n, 2009 Annual Report, Ch. 2, at 8-9 (describing amendment to § 2D1.1 to raise maximum offense level for offenses involving hydrocodone products from 20 to 30).  Absent any reason to believe that the Commission intended that result for the substances at issue here, the Court should adhere to the

Guidelines' express directive to set the offense level at 20.

Second, under the unique circumstances of this case, it is impossible to determine whether a larger quantity of controlled substances translated into a greater harm warranting a stiffer sentence. While the government has taken the absolutist position that every last prescription was inherently harmful because it was issued to an actual or potential addict, in fact untold numbers of prescriptions were issued to individuals who had legitimate needs for FDA-approved medications but chose for other reasons – for example, lack of health insurance – to obtain the medications without a doctor visit.[8]

Third, as the government has candidly conceded, the magnitude of the departure it requests is completely arbitrary. The Guidelines footnote relied upon by the government says nothing about how many levels should be added to account for quantity in excess of the drug table, and the government has supplied no principled rationale for the 4-level increase it seeks. This Court should decline the government's invitation to speculate about where the Sentencing Commission would have drawn lines that it elected not to draw.

Fourth, the government is starved for cases in which district courts have imposed upward departures on similar facts. From a universe of dozens of online pharmacy cases nationwide, the government has identified only three in which upward departures were granted. *See* Letter from AUSA Kirstin Ault to Hon. Charles R. Breyer (March 15, 2013) (Docket No. 1156), at 3-4. Notably, in one of those cases – *United States v. LaCour* – the government *rejected* the government's request for an upward departure as to four of five defendants. All four of those defendants were physicians; the fifth (the only defendant as to whom a departure was granted) was the ringleader of a three-year conspiracy that netted over $85 million for the defendant. *See*

---

[8] The government is fond of asserting that the cost of drugs obtained through Safescripts was greater than the cost to an uninsured of a doctor's visit plus a prescription filled at a local Walgreen's. The government has never supplied a shred of empirical support for this assertion. Even if it could do so, the analysis would have to take into account as well a host of other costs, including transportation from rural areas, lost wages, child care, and other burdens associated with traditional office-based medicine.

1    *United States v. LaCour*, No. 08-cr-00118-ACC-DAB (M.D. Fl. 2009), Docket No. 690, at 9.

2        Finally, the government's argument that the Court should increase Dr. Carozza's sentence

3 because his conduct caused "death and serious bodily injury" is badly misguided. There is no

4 evidence in the record – nor could there be – to substantiate a causal correlation between any

5 prescription issued by Dr. Carozza and an injury suffered by anyone.[9] *See* PSR ¶ 65. Yet even if

6 one were to accept the government's blithe assertion that the "the distribution of drugs to a drug

7 addict contributes to the person's eventual overdose," Letter from AUSA Kirstin Ault to USPO

8 Patrick McFate (Feb. 14, 2013) at 4, the same could be said in *every* drug case. Indeed, the

9 argument would be even stronger in run-of-the-mill drug cases involving Schedule I substances

10 like heroin and methamphetamine, which are by definition far more addictive and dangerous than

11 the substances at issue here. Never, however, has the government contended that an upward

12 departure is warranted in min-run drug cases to account for the possibility that addicts who

13 consume the drugs may ultimately overdose. There is no reason to treat this case differently.

14        **2.**     ***The Abuse-of-Trust Enhancement Does Not Apply***

15        The government seeks a two-level enhancement for the abuse of a position of trust. *See*

16 U.S.S.G. § 3B1.3. For this enhancement to apply, a victim must have placed trust in the

17 defendant, and the defendant must have exploited that trust in order to commit the crime. *See*

18 *United States v. Thornton*, 511 F.3d 1221, 1227 (9th Cir. 2008) (applying enhancement because

19 defendant "abused the authority [the victim] entrusted in him" to "facilitate the commission and

20 concealment of his fraud"); *United States v. Technic Servs., Inc.*, 314 F.3d 1031, 1048 (9th Cir.

21 2002) ("To support the abuse of trust enhancement, 'a *position* of trust . . . must be established

22 _____

23      [9] Incredibly, the government persists in its contention that Dr. Carozza caused the death of
Abigail Volpe, a six-year-old girl who died upon impact with the pavement when her mother

24 crashed into a tree while driving 80 miles per hour down a rural highway waving beer cans out the
window. The government makes this contention based solely on the presence in the mother's

25 purse of a pill bottle bearing Dr. Carozza's name – notwithstanding the absence of evidence that
the mother had ingested the pills, let alone evidence they contributed to her behavior. Particularly

26 in light of the Court's categorical exclusion of the Volpe evidence from trial, the government's

27 persistence in this argument bespeaks a severely distorted perspective.

28

1    *from the perspective of the victim*.'") (citation omitted) (emphasis added), *overruled on other*

2    *grounds by United States v. Contreras*, 593 F.3d 1135, 1136 (9th Cir. 2010).  Absent a

3    relationship of trust with the victim, the enhancement does not apply.  *See United States v.*

4    *Williams*, 527 F.3d 1235, 1250 (11th Cir. 2008) (application of enhancement requires "assessing

5    the defendant's relationship to the victim of the crime" and is proper "only where the defendant

6    has abused discretionary authority entrusted to the defendant by the victim"); *United States v.*

7    *Frykholm*, 267 F.3d 604, 612 (7th Cir. 2001) ("The sentencing court must look beyond formal

8    labels to the relationship between the victim and the defendant and the responsibility entrusted by

9    the victim to the defendant.").

10         Here, the government has repeatedly insisted that Dr. Carozza *lacked* a relationship of trust

11    with the purported victims of the offense.  Indeed, the centerpiece of the government's case was

12    Dr. McCance-Katz's opinion that Dr. Carozza did not have a valid doctor-patient relationship with

13    the individuals to whom he issued prescriptions.  *See* Docket No. 218 (McCance-Katz expert

14    report), at 5 ("In the case of Internet prescribing of controlled substances in Schedules III and IV

15    as is alleged in this case, *this relationship did not exist*.") (emphasis added); *id.* at 11 (opining that

16    prescriptions written "by physicians who had no personal knowledge of the individual ordering the

17    drug(s) other than a brief questionnaire violated the requirements necessary for a legitimate

18    doctor-patient relationship").  Moreover, the government took great pains to illustrate that none of

19    the patients who testified as witnesses at trial had any sort of relationship with Dr. Carozza, let

20    alone a relationship forged on trust.  *See, e.g.*, RT 1137 (Oct. 9, 2012) ("Q. . . . Joseph Carozza, do

21    you have any idea who that is?  A. No.  Q. Was that person ever your doctor?  A. No.").  Because

22    the government contended that there was no relationship of trust between Dr. Carozza and the

23    individuals to whom he issued prescriptions, the abuse-of-trust enhancement does not apply.

24         Nor, on the government's theory, did Dr. Carozza exercise any professional discretion as

25    part of the offense conduct.  *See* U.S.S.G. § 3B1.3 app. n.1 (explaining that a position of trust is

26    "characterized by professional or managerial discretion").  According to the government, Dr.

27    Carozza exercised no medical judgment whatsoever; rather, he simply clicked "approve" on

28

1  request after request for prescription medication.  *See* RT 4804 (Nov. 14, 2012) (government

2  rebuttal argument) ("What he was doing was clicking that 'approve' button as quickly as he could,

3  get through the orders he needed to get through so he could meet his quota for the day, for the

4  week, and every once in a while, 4 percent of the time, he would go in and deny an order and put

5  in some reason.  *That is not exercising medical judgment.*") (emphasis added).

6        The government cannot have it both ways, basing a conviction on the *absence* of a

7  relationship or special skill, then enhancing a sentence because such a relationship or skill existed

8  and was abused.  Having found, over Dr. Carozza's objection, that the government pursued a

9  viable theory of prosecution premised on the lack of a doctor-patient relationship and the lack of

10  medical judgment, the Court should reject the government's effort to increase Dr. Carozza's

11  sentence for abusing a relationship or skill they claim he never had.

12              **3.**     ***Dr. Carozza Should Receive The Two-Level "Safety Valve" Adjustment***

13        Under § 2D1.1(b)(16) of the Sentencing Guidelines, a defendant who meets the criteria for

14  safety-valve eligibility under § 5C1.2 should receive a two-level downward adjustment in his

15  offense level.  *See* U.S.S.G. § 2D1.1(b)(16) ("If the defendant meets the criteria set forth in

16  subdivisions (1)-(5) of subsection (a) of §5C1.2 (Limitation on Applicability of Statutory

17  Minimum Sentences in Certain Cases), decrease by 2 levels.").  Because Dr. Carozza satisfies

18  each of these criteria, the Court should apply the adjustment.[10]

19

20

21  _____

22        [10] A defendant may receive the benefit of the safety valve and the appurtenant two-level
reduction even though he proceeded to trial.  *See United States v. Shrestha*, 86 F.3d 935, 940 (9th

23  Cir. 1996) ("The safety valve statute is not concerned with sparing the government the trouble of
preparing for and proceeding with trial . . . ."); *United States v. Rosenthal*, 266 F. Supp. 1091,

24  1097 (N.D. Cal. 2003) (applying two-level reduction under § 2D1.1(b)(6) after trial).  Likewise,
the offense need not carry a mandatory minimum for the 2-level adjustment to apply.  *See*, *e.g.*,

25  *United States v. Jeffers*, 329 F.3d 94, 104 n.1 (2d Cir. 2003) (Raggi, J., concurring) (stating that
"U.S.S.G. § 2D1.1(b)(6) [now (b)(16)] operates independently from 18 U.S.C. § 3553(f) and

26  U.S.S.G. § 5C1.2(a), in that its base offense level adjustment is available to defendants who satisfy

27  the five criteria even if they do not face mandatory minimum sentences").

28

First, Dr. Carozza does not have more than one criminal history point.  *See id.* §

5C1.2(a)(1); PSR ¶ 86.  Second, Dr. Carozza used no violence and possessed no dangerous

weapons in connection with the offense.  *See id.* § 5C1.2(a)(2).

Third, as set forth above, the offense did not result in death or serious bodily injury.  *See*

*id.* § 5C1.2(a)(3); PSR ¶ 66.  As the Ninth Circuit case law makes clear, the fact that a defendant

distributed inherently dangerous drugs does not disqualify him from safety valve eligibility, even

if those drugs could be traced to injuries suffered by downstream users (which, to be clear, these

drugs cannot).  *See United States v. Lopez*, 163 F.3d 1142, 1144 (9th. Cir. 1998) (holding that

distribution of heroin did not result in death or serious bodily injury so as to disqualify defendant

from safety valve).  Were it otherwise, the safety valve would be rendered a nullity, as no

defendant could ever meet the burden of proving that the dangerous drugs he distributed caused no

injury to anyone – particularly if the injury is defined, as the government has defined it here, to

include the initiation or perpetuation of addiction.  *See United States v. Nelson*, 222 F.3d 545, 551

(9th Cir. 2000) (holding that defendant bears the burden of proving safety-valve eligibility by a

preponderance of the evidence).

Rather, the rare cases in which a defendant is denied safety-valve relief on this basis

involve death or injuries caused in the course of the distribution – for example, a murder

committed in furtherance of a drug conspiracy.  *See*, *e.g.*, *United States v. McCauley*, 659 F.3d

645, 651 (7th Cir. 2011) (affirming denial of safety-valve adjustment to defendant who beat up

drug customer with baseball bat); *United States v. Grimmett*, 150 F.3d 958, 961 (8th Cir. 1998)

(noting denial of safety-valve to defendant convicted of drug conspiracy during which supplier

was killed).  No such facts are present in this case.

Fourth, Dr. Carozza was not an organizer, leader, manager, or supervisor of others in the

offense.  *See* U.S.S.G. § 5C1.2(a)(4); PSR ¶ 65.

Fifth, Dr. Carozza has truthfully provided to the government all information he has

concerning the offense.  *See* U.S.S.G. § 5C1.2(a)(5).  On August 8, 2006, Dr. Carozza and his

counsel met with DEA agents at the DEA field office on Long Island.  As Diversion Group

Case No. CR-10-0642 CRB
DEFENDANT CAROZZA'S SENTENCING MEMORANDUM

1   Supervisor Richard Springer testified at trial, Dr. Carozza provided during that meeting a complete

2   and unvarnished account of his activities.  *See* RT 1527-49 (Oct. 11, 2012) (Testimony of Richard

3   Springer); *accord* Exhibit 3 (DEA Report of Interview).  Dr. Carozza told the DEA, *inter alia*, that

4   he issued prescriptions online based solely on his review of medical questionnaires; that he did so

5   for Chris Napoli's business, which paid him a salary that was wired directly into his bank account;

6   that he wrote as many as 300 to 400 prescriptions a day; that approximately 90% of the

7   prescriptions were for controlled substances; that he issued prescriptions from wherever he had his

8   computer, including New Jersey, New York, and Connecticut; and that he was worried that some

9   people abused the system by ordering drugs too early and changing their names and addresses

10  slightly to disguise the orders.  *See id.*  On the basis of this information, the agents placed a "Code

11  6" on Dr. Carozza's license, precluding its automatic renewal.  *See id.*

12          This truthful, complete information satisfies the final prerequisite for safety-valve

13  eligibility even though Dr. Carozza later challenged the government's proof at trial.  *See Shrestha*,

14  86 F.3d at 940 ("The fact that Shrestha denied his guilty knowledge at trial and at sentencing after

15  his confession to the customs agents does not render him ineligible for the safety valve reduction

16  as a matter of law.").  Accordingly, having met each of the criteria under § 5C1.2(a), Dr. Carozza

17  is entitled to the two-level adjustment afforded by § 2D1.1(b)(6).  Dr. Carozza's total adjusted

18  offense level should therefore be computed as follows: 20 + 2 (mass-marketing) – 2 (safety valve)

19  = 20.[11]

20          **B.      The Court Should Vary Downward To Probation**

21          At offense level 20, the advisory Guidelines range is 33 to 41 months.  For all of the

22  reasons discussed above, the Court should vary downward to a sentence of probation.

23  _____

24          [11] Although Dr. Carozza objected to the draft presentence report on the grounds that it
25  omitted the safety-valve reduction, the final report did not address this objection.  However, given
    the findings in the report – particularly the findings that Dr. Carozza was not a manager or leader,
26  (¶ 65) and did not cause death or serious bodily injury (¶ 66) – the probation officer should have
27  included the adjustment in his sentencing computation.

28

First, the Court should vary downward to avoid unwarranted disparities vis-à-vis doctors prosecuted in other jurisdictions, doctors who were never prosecuted in any jurisdiction, and Dr. Carozza's codefendants in this case.

Second, the Court should vary downward given the absence of any real deterrent effect from the sentence in this case. There is obviously no need for individualized deterrence as to Dr. Carozza, who has surrendered his license to practice. Nor, given the intervening passage of the Ryan Haight Act, will the Court's sentence have any deterrent impact on other physicians. Now that federal law expressly requires an in-person examination as a condition of a valid prescription, online pharmacies like Safescripts have all but disappeared in the United States. *See* Grand Jury Testimony of SA Jason Chin, RT 24-25 (Mar. 16, 2010). It follows that there is no need for the Court to impose a custodial sentence on Dr. Carozza to deter similar conduct by others.

Finally, the Court should vary downward because, in the Court's own words, "this [case] is way out of the ordinary of criminal cases." RT 10 (Mar. 23, 2011). Notwithstanding the jury's verdict, Dr. Carozza simply is not a drug dealer. He is an accomplished physician with a long record of commitment to patient care who, for eleven months, wrote prescriptions for approved medications based on medical questionnaires. At 67 years of age, he has paid the price in professional, personal, and financial ruin.[12]

For all of the reasons that make this case extraordinary, a term of probation is sufficient but not greater than necessary to serve the purposes of sentencing. The Court should sentence Dr. Carozza to probation with such conditions as may be warranted to promote respect for the law, including forfeiture of proceeds and withdrawal from the practice of medicine.

---

[12] Dr. Carozza has been unable to practice medicine since the DEA declined to renew his license in 2007 – five years before his conviction – without any process whatsoever. The government has now moved for forfeiture of Dr. Carozza's medical license to the United States Treasury. Dr. Carozza has opposed this motion on due process and federalism grounds. *See* Docket No. 1104. But whether Dr. Carozza forfeits his state-issued license to the federal government or surrenders it to the licensing board in New York, the inevitable result is the same: he will never practice medicine again.

**CONCLUSION**

For all of the reasons stated, the Court should sentence Dr. Carozza to probation.

DATED: March 19, 2013                    Respectfully submitted,


                                         By   /s/
                                              Josh A. Cohen
                                              Nicole Howell Neubert
                                              Attorneys for JOSEPH CAROZZA