1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   MIRANDA KANE (CABN 150630)
3  Chief, Criminal Division

4  KIRSTIN M. AULT (CABN 206052)
   Assistant United States Attorney
5
      450 Golden Gate Ave., Box 36055
6     San Francisco, California 94102
      Telephone: (415) 436-6940
7     Facsimile: (415) 436- 7234
      E-mail: kirstin.ault@usdoj.gov
8
   Attorneys for United States of America
9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12              SAN FRANCISCO DIVISION

13  UNITED STATES OF AMERICA,          )    No.   CR 10-0642 CRB
                                       )
14        Plaintiff,                   )    UNITED STATES' SENTENCING
                                       )    MEMORANDUM FOR DEFENDANT JOSEPH
15  v.                                 )    CAROZZA AND MOTION FOR UPWARD
                                       )    DEPARTURE
16  JOSEPH CAROZZA,                    )
                                       )    Hearing Date: March 26, 2013
17                                     )    Time: 10:00 a.m.
          Defendant.                   )    Court: Hon. Charles R. Breyer
18                                     )
                                       )
19  _____)

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.      Sentencing Guidelines.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

          1.      Abuse of Position of Trust or Special Skill. . . . . . . . . . . . . . . . . . . . . . 4

          2.      Upward Departure for Excessive Drug Quantity. . . . . . . . . . . . . . . . . . 5

    B.      Factors Under 18 U.S.C. § 3553(a) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

          1.      Nature and Circumstances of the Offense. . . . . . . . . . . . . . . . . . . . . . . 6

               a.      Death or Serious Bodily Injury. . . . . . . . . . . . . . . . . . . . . . . . 6

          2.      History and Characteristics of the Defendant. . . . . . . . . . . . . . . . . . . 10

          3.      Seriousness of the Offense, Respect for the Law, Just Punishment, Adequate Deterrence, Protection of the Public Rehabilitation of the Defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          4.      Sentencing Commission Policy Statements. . . . . . . . . . . . . . . . . . . . . 12

          5.      Unwarranted Sentencing Disparity. . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

1  **TABLE OF EXHIBITS**

2  A.   Arnold Trial Transcripts

3  B.   Arnold Trial Exhibits

4  C.   Napoli Trial Transcripts

5  D.   Napoli Trial Exhibits

6  E.   Arnold Financial Documents

7  F.   Joseph B

8  G.   Abigail V

9  H.   Joyce W

10 I.   Sarah H-P

11 J.   Rick K

12 K.   Evan B

13 L.   Johnson Skype

14 M.   Herholz Financial Documents

15       M-1   Ocean Rayz Incorporation Records
         M-2   Ocean Rayz Bank Records
16       M-3   Ocean Rayz Deposits
         M-4   Ocean Rayz Cash Withdrawals
17       M-5   Ocean Rayz Check Card Payments at Casinos
         M-6   Ocean Rayz Asset Purchase Agreement
18       M-7   Tanning Salon Sales
         M-8   Artichoke Joe's Records
19       M-9   Transcript of April 11, 2012 Hearing

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Gall v. United States,* 552 U.S. 38 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

*United States v. Brown*, 553 F.3d 768 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Johnson*, 71 F.3d 539 (6th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Jones*, 696 F.3d 695 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. LaCour*, CR 08-118 (M.D.Fla. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Ressam*, 679 F.3d 1069 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Vogel*, CR 08-224 (E.D.Tex. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. White*, CR 09-682 (E.D.Pa. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Yi,* 2013WL11890 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## FEDERAL STATUTES, RULES AND GUIDELINES

18 U.S.C. § 3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

21 U.S.C. § 841(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

21 U.S.C. § 846. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

U.S.S.G. § 2D1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5

U.S.S.G. § 3B1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

U.S.S.G. § 3B1.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-4

U.S.S.G. § 3B1.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

U.S.S.G. § 5K2.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

U.S.S.G. § 5K2.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

U.S.S.G. § 5K2.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

# INTRODUCTION

The United States respectfully recommends the following sentences for the defendants convicted in this matter:

| Defendant | Conviction | PSR Range | PSR Recom. | US  Range | US Recom. |
|---|---|---|---|---|---|
| M. Arnold | Trial | 97-121 | 63 | 151-188 | 120 |
| C. Napoli | Trial | 97-121 | 97 | 188-235 | 120 |
| D. Johnson | Trial | 63-78 | 78 | 168-210 | 108 |
| J. Herholz | Trial | 97-121 | 73 | 97-121 | 73 |
| **J. Carozza** | **Trial** | **51-60** | **60** | **78-97** | **60** |
| S. Lamorte | Cooperation plea | 78-87 | 78 | 41-51 | 15 |
| J. Entel | Cooperation plea | 46-57 | 46 | 46-57 | 27 |
| D. Antonioni | Cooperation Plea | 24-30 | 9 | 12-18 | 18 |
| D. Creque | Cooperation Plea | 30-37 | 3 years probation | 30-37 | 5 years probation |

The United States believes that a sentence of 60 months is appropriate for defendant Joseph Carozza because it provides appropriate punishment for a doctor who betrayed the trust of his profession by using his medical license and DEA registration to illegally distribute drugs. The offense is serious as it involved not only the distribution of drugs but the perpetration of a fraud in that Carozza represented to Safescripts' customers that he was using his medical knowledge and skill to review their drug orders and approve medication only where it was medically necessary.  Instead, Carozza simply clicked an "approve" or "deny" button as often as required to earn the $400,000 Napoli was willing to pay him to provide an air of legitimacy to Napoli's patently illegal operation.  The Court should also consider the excessive quantity of drugs Carozza enabled Napoli to distribute and the fact that and that Carozza's abuse of his medical license resulted in death and serious physical and psychological injury.  Moreover, the importance of deterrence cannot be overstated.  It is clear that Carozza made a calculated

1    decision to engage in conduct that he knew was illegal, unethical and immoral under the

2    misguided belief that if he were caught, he might lose his medical license, but he would not be

3    sent to prison. It is particularly important that other physicians be made aware that using their

4    medical licenses to sell controlled substances will result in significant punishment. All these

5    circumstances make a 60 month sentence sufficient, but not greater than necessary, to achieve the

6    goals of punishment, deterrence and rehabilitation.

7         Although the Guidelines provide for a longer sentence, the United States believes that a

8    term longer than 60 months is not warranted here because Carozza has minimal criminal history,

9    the offense did not involve the deliberate infliction of violence, Carozza played no leadership

10   role in the organization, Carrozza's participation was for a shorter (although still significant)

11   period of time than his co-conspirators, and the chance that Carozza will commit further crimes

12   after serving a lengthy prison term is minimal, as he will lose his medical license.

13                                    **BACKGROUND**

14        On August 31, 2010, the grand jury returned a 13-count indictment charging eleven

15   defendants[1] with drug trafficking and international money laundering in connection with three

16   separate but related Internet pharmacy operations: PharmacyUSA/SafescriptsOnline

17   ("PSA/SSO"), Pitcairn, and United Mail Pharmacy Services ("UMPS"). Clerk's Record ("CR")

18   1. On December 7, 2010, a superseding indictment was returned that made minor technical

19   changes to the indictment. CR 144.

20        On August 24, 2011, Salvatore Lamorte and Darrell Creque entered guilty pleas and

21   agreed to cooperate with the United States. CR 307, 308. On June 1, 2011, the Court ordered

22   that the counts charging the three separate Internet pharmacies would be severed for trial.

23   CR 252. On June 22, 2011, the Court further ordered that the charges involving the Pitcairn

24   Internet pharmacy would proceed to trial first. CR 264.

25

26        [1]    Two defendants, Steven Paul and Diego Paes, will not be sentenced. The case
27   against Paul was dismissed upon suggestion of death on March 7, 2011. CR 221. Paes, a citizen
     of Brazil, remains a fugitive.

28

On February 2, 2012, trial involving the Pitcairn-related charges commenced. CR 558. On March 1, 2012, Arnold and Herholz were found guilty of all charges. CR 645.

On March 2, 2012, the Court ordered that trial of the Safescripts-related counts would commence on April 9, 2012. CR 650. That trial date was eventually continued to October 1, 2012. CR 881.

On April 11, 2012, Dino Antonioni and Jeffrey Entel entered guilty pleas and agreed to cooperate with the United States. CR 698, 702. On that date, Jeffrey Herholz entered guilty pleas to the remaining counts without a plea agreement. CR 701.

On October 1, 2012, trial involving the Safescripts-related charges commenced. CR 920. On November 15, 2012, Napoli, Johnson and Carozza were found guilty of all counts. CR 1068.

## DISCUSSION

### A. Sentencing Guidelines

The United States agrees with the Probation Officer's Guidelines calculations, with the exception that the United States believes that a 4-point upward departure is warranted under U.S.S.G. § 2D1.1, Application Note 26(B) because the drug quantity substantially exceeds the 40,000-pill cap established for the highest offense level of 20.

| Guideline | Factor | Offense Level |
|---|---|---|
| *Drug Trafficking* (21 U.S.C. § 846, 841(a)(1)) - Counts 1-2 | | |
| 2D1.1(a)(5)(c)(10) | Base offense level:<br>40,000 or more units of Schedule III controlled substances | 20 |
| 2D1.1(b)(7) | Mass marketing/use of interactive computer service | +2 |
| 3B1.3 | Abuse of Position of Trust or Use of Special Skill | +2 |
| **Total Drug Offense Level** | | **24** |
| 2D1.1, App. N. 26(B) | Upward Departure for drug quantity | +4 |
| **Total Offense Level** | | **28** |
| **Adjusted Guidelines Range** (CHC = I) | | **78-97** |

///

1.      <u>Abuse of Position of Trust or Special Skill</u>

The United States agrees with the Probation Officer that Carozza's base offense level should be increased under Section 3B1.3 for Abuse of Position of Trust or Use of Special Skill. As stated in Application Note 4, "'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing.  Examples would include pilots, lawyers, *doctors*, accountants, chemists, and demolition experts." (emphasis added).  Carozza, as a physician who reviewed and approved drug orders for the PSA/SSO conspiracy qualifies for this adjustment.  *U.S. v. Johnson,* 71 F.3d 539, 544 (6th Cir. 1995) (increase for use of special skill applies to doctor convicted of illegal distribution of pharmaceuticals because offense of conviction did not apply only to doctors, and thus special skill was not included in base offense level or specific offense characteristics).

Even if the Court determines that Carozza did not actually use his "skill" as a physician to conduct the offense, Carozza qualifies for the two-point increase under the "abuse of position of trust" prong of the Guideline.  Application Note 3 states that this adjustment is available when a defendant "(B) perpetrates a fraud by representing falsely to a patient or employer that the defendant is a licensed physician.  In making the misrepresentation, the defendant assumes a position of trust, relative to the victim, that provides the defendant with the same opportunity to commit a difficult-to-detect crime that the defendant would have had if the position were held legitimately."  By using his license and DEA registration number, as well as the title of "doctor," Carozza was representing to the "patients" who used co-defendant Napoli's website that he was using his skills and training as a physician to evaluate their medical information and write a prescription to treat their condition.  Similarly, Carozza's use of his license and DEA registration allowed defendant Napoli to represent to the pharmacies that were filling the prescriptions that the drugs orders placed by his customers were legitimate.  Without the facade of legitimacy created by Carozza's prescriptions, co-defendant Napoli would not have been able to find pharmacies willing to fill his drug orders or credit card companies willing to process his transactions.  Moreover, the presence of Carozza's prescriptions made it more difficult to detect

the crime, as they provided an air of legitimacy to Napoli's operation.  This misuse of Carozza's medical credentials constitutes an abuse of trust that warrants a two-point increase to his base offense level.

       2.    <u>Upward Departure for Excessive Drug Quantity</u>

The Sentencing Guidelines state that an upward departure may be warranted where the quantity of drugs distributed substantially exceeds the quantity for the highest offense level established for that particular controlled substance.  U.S.S.G. § 2D1.1, App. N. 26(B).  In this case, the quantities Carozza is actually responsible for distributing exceed by significant multiples the 40,000-pill cap established in the Guidelines.  Carozza's approval of over 1,000,000 Schedule III controlled substances is 25 times the Guidelines' maximum for level 20, and his approval of over 13 million pills of Schedule IV controlled substances is over 300 times the maximum quantity of 40,000 pills for the highest offense level of 12.   Therefore, an upward departure is warranted.  *See* Napoli Trial Exhibit ("NTEx.") 20D.[2]

Using the Drug Equivalency Table provided in Application Note 8(D) to U.S.S.G. §2D1.1, the drugs Carozza approved are equivalent to 2,484 kilograms of marijuana (1,668,420 Schedule III x 1 gm = 1,668 kg + 13,061,970 x .0625 gm = 816 kg).  Using this calculation, Carozza's base offense level would increase 12 levels from 20 to 32 (1,000-3,000 kg of marijuana).  The United States believes that a 12-level increase in this case would be excessive.[3]

---

[2]    Relevant exhibits from the trial of Napoli, Johnson & Carozza are submitted as Exhibit D.  All exhibits are contained in the United States' Consolidated Exhibits for Sentencing Memoranda filed concurrently herewith.

[3]    An upward departure has been applied on this ground in other Internet pharmacy cases.  *See*, *e.g.*, *United States v. White*, CR 09-682 (E.D. Pa. 2013) (applying an upward departure of 30 months from a Guidelines' range of 63-78 months to a sentence of 108 months); *United States v. Lacour*, CR 08-118 (M.D.Fla. 2012) (applying an upward departure of 5 levels to arrive at a sentence of 97 months); *United States v. Vogel*, CR 08-224 (E.D.Tex. 2012) (applying upward departure of 10 levels to level 30 and a sentence of 240 months).  *See also United States v. Brown*, 553 F.3d 768, 776-77, 800 (5th Cir. 2008) (affirming upward departures "based on excessive drug quantity and the toxicity of the combined drugs involved" where pharmacists were convicted after trial of filling Schedule III prescriptions for an illegal "pain

1    A 4-level increase, which corresponds to increases provided by the Guidelines for other serious

2    factors (*see, e.g.*, § 3B1.1 (role); 3B1.5 (use of body armor)), appropriately accounts for the fact

3    that Carozza's conduct was substantially more egregious than the most serious offense

4    contemplated by the Guidelines.

5    **B.      Factors under 18 U.S.C. § 3553(a)**

6          1.    <u>Nature and Circumstances of the Offense</u>

7          The nature of the offense is serious.  Carozza approved orders for millions of doses of

8    addictive and dangerous controlled substances to thousands of people located throughout the

9    United States without the medical supervision necessary to ensure that the persons ingesting the

10   drugs did so safely and responsibly.  Carozza reviewed and approved thousands of drug orders

11   every week, taking no more than a few seconds to review each order.  *See* NTEx. 20E.  By not

12   even requiring that customers state the medical condition for which they were seeking the drug,

13   Carozza's conduct ensured that users could and would obtain controlled substances for no reason

14   other than that they wanted them and did nothing to prevent drug addicts from obtaining

15   potentially lethal quantities of dangerous drugs.  Indeed, except in rare circumstances where he

16   denied orders as "too soon," Carozza provided Napoli's customers with as many drugs as they

17   wanted as often as they wanted them.  When he was confronted by the DEA with questions about

18   his conduct, Carozza denied that he was practicing medicine and said that he hoped there would

19   not be too many horror stories resulting from his conduct.  Napoli Trial Transcript ("NTT")

20   1535-36[4].  Following this visit, Napoli increased Carozza's salary from $7,500 to $10,000 per

21   week, and Carozza continued to approve orders as he had done before.  *See* NTEx. 20E.

22          *a.      Death or Serious Bodily Injury*

23          Carozza approved orders for large quantities of life-threatening drugs with no controls to

24   _____

25   clinic.").

26          [4]      Relevant portions of the Napoli, Johnson & Carozza trial transcript are submitted
27   as Exhibit C.  All exhibits are contained in the United States' Consolidated Exhibits for
     Sentencing Memoranda filed concurrently herewith.

28

ensure the safety of his "patients".  As a result, Carozza's illegal conduct resulted in the death and serious injury of countless persons.  Carrozza primarily approved orders for large quantities of two types of drugs:  benzodiazepenes (e.g. Xanax, Vallium) and stimulants (e.g. phentermine, phendimetrazine).  Benzodiazepenes are central-nervous system depressants that can cause the heart and lungs to cease functioning when taken in sufficient quantities.[5]  Moreover, once a person is addicted to alprazolam (Xanax), sudden withdrawal can cause life-threatening seizures. Stimulants such as phentermine can cause increased blood pressure, pulmonary arterial hypertension, and, eventually death.  All of these drugs are subject to physical and psychological addiction.  Once addicted, a person requires increasing quantities of the drugs to achieve the desired effect.  Addicts can and will take increasingly large quantities of these drugs until, eventually, they may overdose and die.  As a result, Carozza's conduct by its very nature carried a substantial likelihood that it would result in the death and serious bodily injury of his drug customers.  *See United States v. Yi*, 704 F.3d 800, 806-07  (9th Cir. 2013) (finding that the district court did not clearly err in concluding that the defendant's conduct created a substantial likelihood of death or serious injury based on the danger of inhaling any form of asbestos and the defendant's employees' failure to take any precautions to prevent asbestos from contaminating the area during removal).

Although Carozza's conduct undoubtedly led to countless deaths, hospitalizations and serious medical complications, addicts frequently ordered drugs from multiple sites and overdosed on a combination of drugs obtained from different sources, making it difficult to conclusively attribute a person's death to a single Internet pharmacy.  Nevertheless, there exists clear evidence that Carozza contributed to the death, addiction and serious medical complications of the following identifiable persons:

*Joseph B.* - In the spring of 2006, Joseph B was admitted to the hospital for alprazolam

---

[5]     The facts regarding the effects of the controlled substances approved by Carozza and their link to serious injury and death are taken from he trial testimony of Dr. Elinor McCance-Katz.  *See, e.g.,* NTT 617-21; 629-31; 633-37.

1   poisoning following an incident in March of 2006 where he vomited blood and passed out at

2   work.  *See* Ex. F.  On March 10, 21, and 22, Kwic Fill shipped three separate orders of 90 pills of

3   alprazolam to Joseph B based on orders he placed with Safescripts that were approved by Dr.

4   Carozza.  *Id*.  A fourth order was shipped on April 10, 2006 from Woodbury Pharmacy.  *Id*.

5   Joseph B's family and friends staged an intervention, and Joseph B entered a treatment program

6   to withdraw from alprazolam.  *Id*.  While he was participating in this treatment program, he

7   placed another order for 90 pills of alprazolam that was approved by Dr. Carozza and shipped to

8   him on June 6, 2006, arriving on June 8, 2006.  *Id*.  Three days later, on June 11, 2006, Joseph B

9   was found dead after overdosing on alprazolam and Fentanyl (a pain medication for cancer

10  patients).  *Id*.

11      *Abigail V.* - On February 24, 2006, Kelly V was involved in a single-car accident in

12  which her 6-year old daughter Abigail was thrown from the truck Kelly V was driving and killed.

13  *See* Ex. G at NAP-00069746-47.  Officers at the scene recovered a bottle of alprazolam (Xanax)

14  from Kelly V's purse following the accident.  *Id*. at NAP-00070147-51; 70155-56; 70395, 70400.

15  PSA/SSO records show that an order for alprazolam was processed through the Safescripts

16  system, approved by Dr. Carozza, and shipped to Kelly V from Kwic Fill on or about February

17  22, 2006, two days before the accident that killed Abigail.  Ex. G.  The label on the pill bottle

18  found in Kelly V's purse confirms that the alprazolam (Xanax) was purchased on or about

19  February 22, 2006, and filled by Kwic Fill based on a prescription issued by Dr. Carozza.  *Id*. at

20  NAP-00009938-39, 70395, 70400.  The post-accident report indicated the presence of

21  benzodiazepenes in Kelly V's blood and an absence of alcohol.  *Id*. at NAP-00070061-62.

22  Alprazolam (Xanax) is a benzodiazepene.  *Id*. at NAP-00070262-65. The pill bottle indicated

23  that it originally contained 60 pills; however, only 39 whole pills and 16 half-pills remained.  *Id*.

24  at NAP-00070156.  A paramedic also testified that at the scene of the accident Kelly V's pupils

25  were constricted, which is consistent with her having taken drugs.  Several witnesses testified at

26  trial that Kelly V was driving erratically prior to the accident - so much so that they called 911

27  and followed her vehicle until she drove off the road, crashing into a tree.  *Id*. at NAP-00069746-

28

47.

Kelly V was convicted by a jury of one count of aggravated vehicular homicide based on a finding that she caused Abigail's death as a result of driving while under the influence of alcohol and/or drugs, a second count of aggravated vehicular homicide based on a finding that she recklessly caused Abigail's death while operating a motor vehicle, and one count of operating a vehicle under the influence of alcohol, drugs, or a combination of alcohol and drugs. *Id*. at NAP-00070338-344; 70351-353. The jury found that Kelly V had been convicted of 5 or more violations of driving under the influence in the previous 20 years. *Id*. at NAP-00070351-353. Kelly V was sentenced to 20 years in prison as a result of these convictions. *Id*. at NAP-00070374. At sentencing, a letter from Kelly V's husband was read into the record, which explains the impact that Kelly V's conduct and the resulting death of his daughter had on him. *Id*. at NAP-00070358-361. Kelly V's lawyer explained that her conduct was the result of a twenty-year addiction to Xanax (alprazolam). *Id*. at NAP-00070362.

*Joyce W* - On January 27, February 14, 17, 22, 23, and March 7, 2006, Kwic Fill shipped a total of 5 orders of cardisoprodol, 1 order of diazepam (Valium), and 1 order of alprazolam (Xanax) to Joyce W based on orders placed through Safescripts that were approved by Dr. Carozza. Ex. H. On March 7, 2006, Joyce W's son contacted the DEA after his mother had overdosed three times in the preceding three weeks on cardisoprodol and Valium that she had been ordering over the Internet. *Id*. Joyce W's son provided agents with a number of prescription labels that were found at Joyce W's home, including one from Kwic Fill pharmacy reflecting a prescription issued by Dr. Joseph Carozza. *Id*. In the following months after the hospitalization resulting from her repeated overdoses, Joyce W succeeded in obtaining from Safescripts and Dr. Carozza an additional 2 orders of diazepam (Valium), 2 orders of cardisoprodol and 1 order of Flexeril (a muscle relaxant). *Id*.

*Sarah H-P* - On February 16, 2006, Dan P, a pharmacist from Virginia, reported to the DEA that his friend's wife, Sarah H-P, was addicted to Lorazepam and Clonazepam. *See* Ex. I at NAP-00003231. Sarah H-P recently had been admitted into a rehabilitation program because she

1    was taking up to 25 pills a day.  *Id.*  Dan P found several packages of controlled substances that

2    were sent to Sarah H-P from various Internet pharmacies prior to February 16, 2006.  *Id.* at NAP-

3    00003231-32.  One of the packages contained Lorazepam that was sent to Sarah H-P on or about

4    February 8, 2006, from Kwic Fill.  *Id.* at NAP-00003232-33; 3244.  The order was placed

5    through Safescripts, and Dr. Carozza was listed on the pill bottle as the approving physician.  *Id.*

6    at NAP-00003232-33; 3243.

7        *Rick K* - On February 17, 2006, Larry K reported to the DEA that his brother, Rick K,

8    was addicted to alprazolam (Xanax) that he was ordering over the Internet.  *See* Ex. J at NAP-

9    00002629.  Larry K placed his brother in a treatment program where it was discovered that Rick

10   K had been ingesting potentially lethal amounts of alprazolam.  *Id.* at NAP-00002630.  Larry K

11   provided three bottles of alprazolam that had been sent to his brother Rick.  *Id.*  One of the

12   bottles indicated that the prescribing physician was Dr. Joseph Carozza.  *Id.* at NAP-00002632.

13   Larry K also found a FedEx envelope stating that the alprazolam had been shipped from Kwic

14   Fill, based on an order placed through Safescripts.  *Id.*  Safescripts database records indicate that

15   this was one of three orders for 90 pills of alprazolam that Rick K had placed with Safescripts in

16   a one month period.  *Id.*  All three orders were shipped to Rick K from Kwic Fill based on

17   prescriptions issued by Dr. Carozza.  *Id.*

18       By feeding the addictions of these individuals, Carozza contributed to their increased

19   tolerance reinforcing their addiction, eventually leading to medical complications,

20   hospitalizations, and the deaths of Joseph B and Abigail V.

21           2.    History and Characteristics of the Defendant

22       Carozza is a licensed medical doctor who abused the trust placed in him by the State of

23   New York and the DEA to illegally distribute millions of doses of controlled substances without

24   exercising any medical judgment or taking any steps to ensure that the drugs he was approving

25   did not fall into the hands of addicts, teenagers, drug dealers or persons who could be harmed by

26   taking the drugs he was prescribing.  As demonstrated by his previous work history, Carozza had

27   the ability to make a good living using the skills and education he had obtained to help those in

28

1   need.  Instead, greed and sloth led him to sell his medical license and DEA number to the highest

2   bidder.  Carozza made over $400,000 in just 11 months by sitting at home and clicking on the

3   "approve" button for Napoli's website.  As demonstrated by his conversation with Diversion

4   Investigator Springer, Carozza knew that he was not "practicing medicine" as required for a

5   licensed physician and that his conduct could result in "horror stories."  Carozza's callous

6   disregard for the health and safety of the "patients" who sought drugs from PSA/SSO is

7   disturbing.  Moreover, his previous conviction for tax fraud demonstrates that this is not the first

8   time that Carozza decided that the law does not apply to him.  Carozza's wilful and wanton

9   disregard, not only of the law, but of the ethical and moral requirements of his profession

10  warrants a serious punishment.

11              3.      Seriousness of the Offense, Respect for the Law, Just Punishment, Adequate
                        Deterrence, Protection of Public, Rehabilitation of Defendant
12

13          Because of the large amount of profit that can be made from the illegal sale of drugs over

14  the Internet, and the relative anonymity with which this crime can be perpetrated, a serious prison

15  sentence is necessary to insure adequate deterrence, promote respect for the law, protect the

16  public and account for the seriousness of the offense.  *See Gall v. United States*, 552 U.S. 38, 54

17  (2007) (noting the government's "legitimate concern that a lenient sentence for a serious offense

18  threatens to promote disrespect for the law").  The concern about disrespect for the law is even

19  more prevalent in this type of case than in other drug or fraud cases because here it is clear that

20  Carozza was aware that his conduct was illegal and unethical, but he chose to take the risk that

21  he would be caught, betting that the prospect of losing his medical license would be balanced by

22  the large profit he stood to gain from selling "only" Schedule III and IV drugs over the Internet.

23  It is imperative that other doctors contemplating using their medical licenses and DEA

24  registrations to engage in the illegal sale of controlled substances understand that the calculation

25  of jail versus money will not come out in their favor.  This is especially imperative in Carozza's

26  case, because doctors must understand that they will not escape serious consequences, including

27  lengthy prison terms, if they misuse their medical credentials to distribute controlled substances

28

to persons who do not need them and for whom proper medical safeguards have not been followed.

### 4.  Sentencing Commission Policy Statements

Under the Sentencing Commission's policy statement set forth in § 5K2.1, "[i]f death resulted, the court may increase the sentence above the authorized guideline range." U.S.S.G. § 5K2.1 (2006).  Similarly, an upward departure may be warranted where "significant physical injury" or "extreme psychological injury" occurred as a result of the offense.  *See* U.S.S.G. §§ 5K2.2, 5K2.3 (2006).  In this case, there is substantial evidence linking drugs approved by Carozza to identifiable cases of physical and psychological harm.

### 5.  Unwarranted Sentencing Disparity[6]

The concern for unwarranted sentencing disparity is largely addressed by sentencing a defendant to within the correctly-calculated Guidelines' range.  See *Gall*, 552 U.S. at 54 ("[A]voidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges.  Since the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities."); *United States v. Jones*, 696 F.3d 695 (7th Cir. 2012) ("Sentencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly.") (quotation omitted).  Moreover, the Court must be conscious of the need "to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated."  *Gall*, 552 U.S. at 55 (emphasis in the original). Carozza's sentence should not be compared to others whose crimes involved less egregious conduct, who lack criminal history, who entered timely guilty pleas or who cooperated with the United States.  *United States v. Ressam*, 679 F.3d 1069, 1095 (9th Cir. 2012) ("We agree and reject the comparison of Ressam's sentence to defendants who pleaded guilty or were convicted of much less serious offenses.").  A sentence of 60 months appropriately situates Carozza with

---

[6]     The United States incorporates its response to the Court's questions on this issue, submitted at Docket No. 1156.

respect to his co-defendants Napoli, Johnson and Herholz, all of whom were convicted of money laundering, as well as drug trafficking, all of whom were leaders and managers, and all of whom made more money than Carozza from the conspiracy.

## CONCLUSION

For the reasons stated above, the United States believes that a sentence of 60 months of imprisonment, followed by 3 years of supervised release, a $200 special assessment, and an appropriate fine should be imposed in this case. The United States also requests that the Court enter a money judgment in the amount of $400,067, as set forth in the Amended Preliminary Order of Forfeiture. The United States finally requests that the Court order that Carozza forfeit his interest in the property identified in the Second Amended Exhibit 1 to the Amended Preliminary Order of Forfeiture.

DATED: March 19, 2013                    Respectfully submitted,

                                         MELINDA HAAG
                                         United States Attorney

                                              /s
                                         _____
                                         KIRSTIN M. AULT
                                         Assistant United States Attorney

U.S. SENTENCING MEMORANDUM - CAROZZA
CR 10-0642 CRB                    13